CITY OF DETROIT v DETROIT PLAZA LIMITED PARTNERSHIP

Docket No. 258479. Submitted September 12, 2006, at Detroit. Decided December 19, 2006, at 9:05 a.m. Leave to appeal sought.

The city of Detroit brought an action in the Wayne Circuit Court to condemn property owned by Detroit Plaza Limited Partnership (DPLP) and others under the Uniform Condemnation Procedures Act (UCPA), MCL 213.51 *et seq.*, as part of a riverfront development project. After hearing testimony from both parties' expert appraisers, a jury determined the fair market value of the property to be $25 million. The trial court, Michael F. Sapala, J., entered a judgment for that amount, and also granted DPLP's motion to recover fees it paid to its attorney and expert. The city appealed.

The Court of Appeals *held*:

1. Regardless of whether transactions involving the exchange of property are generally admissible in condemnation proceedings in Michigan, the trial court did not abuse its discretion by excluding evidence relating to a 1996 sale of riverfront property adjacent to the property at issue that the city's appraiser had used for purpose of comparison. The trial court did not exclude the evidence because the sale was a like-kind property exchange or because the evidence was unfairly prejudicial, but rather because use of the transaction as evidence of the subject property's fair market value would have required the jury to consider a number of collateral issues, and thus the probative value of the evidence was substantially outweighed by the danger of confusing or misleading the jury.

2. The trial court did not err by admitting evidence of land sales that were located within the project area that DPLP's appraiser had used to confirm his valuation. Excluding the evidence on the ground that the sales reflected a noncompensable element of value—namely, speculation regarding the placement of casinos nearby that inflated the properties' values—would have been inconsistent with the applicable caselaw, statutory provision, and jury instruction, all of which contemplate that such evidence may be admissible. In considering such evidence, however, the jury must exclude any value deriving from speculation about the project from the compensation it ultimately awards.

3. Evidence relating to the land sales within the project area was not inadmissible solely because the sales were made to a condemnor. Although a majority of jurisdictions holds that evidence of such sales is irrelevant to compensable value because it does not reflect what a willing buyer would have paid to a willing seller, other jurisdictions have recognized that purchases by public bodies are not necessarily tainted with threats of compulsion. The minority view is more consistent with the liberal standards for the admissibility of evidence that Michigan employs.

4. The trial court did not err by admitting evidence of sales that occurred after the date of valuation applicable to the subject property. The Court of Appeals has rejected the view that just compensation for property taken pursuant to the UCPA is to be determined only by considering the condition of the property and the state of the market on the date of valuation, and courts generally allow evidence of sales that occur within a year of the date of valuation, which the sales at issue did.

5. The trial court did not abuse its discretion in excluding evidence of DPLP's internal disputes regarding the subject property. Although all evidence tending to affect market value is relevant for purposes of condemnation valuation, the disputes, which may have been a factor in the partnership's failure to develop the property before the taking, had no effect on the property's market value, which is determined by means of a "highest and best use" analysis that disregards how the property was actually used. Further, even if the evidence had been improperly excluded, the error would have been harmless, because DPLP's appraiser did not take into account the various project proposals the partnership considered, and other evidence established that these proposals never moved past the initial planning stages.

6. The trial court did not abuse its discretion in excluding evidence of an alleged offer to sell the property to the city. Although unwritten offers to sell property are admissible for purposes of condemnation valuation if the offers are shown to be bona fide, the trial court concluded in this case that the breadth of litigation necessitated by the absence of a consensus among the witnesses regarding the amount of the offer could sidetrack or otherwise confuse the jury.

7. The question whether the trial court erred in limiting the testimony of the city's expert witness, who conducted an "acquisition appraisal" of the property, was not preserved for review

because the city did not make an offer of proof regarding the substance of the testimony alleged to have been improperly excluded.

8. The trial court did not abuse its discretion by awarding DPLP the maximum attorney fee permissible under the UCPA. The UCPA mandates reimbursement, in whole or in part, of the owner's reasonable attorney fees, and the trial court properly considered the relevant factors in determining that the claimed fees were reasonable. The award was supported by the evidence and it furthered the statutory policy of ensuring that the property owner is placed in as good a position as that occupied before the taking.

9. The trial court did not abuse its discretion in concluding that DPLP's request for reimbursement of expert fees was reasonable. Although the monthly invoices submitted lacked detail, other evidence indicated that the work involved was extremely complex and that the expert in question, who was recognized as a premier condemnation appraiser, performed exceptionally well. Further, the city submitted no evidence to dispute the appropriateness of the fee.

Affirmed.

1. EMINENT DOMAIN — JUST COMPENSATION — EVIDENCE — FAIR MARKET VALUE — PROJECT-RELATED SALES.

Evidence of land sales within a development project area are admissible to establish proper valuation of property subject to condemnation; however, the jury must then exclude any value derived from speculation about the project from the compensation it ultimately awards (MCL 213.70).

2. EMINENT DOMAIN — JUST COMPENSATION — EVIDENCE — FAIR MARKET VALUE — SALES TO CONDEMNOR.

Evidence of other sales to a condemnor used to support an expert witness's opinion regarding the fair market value of a condemned parcel of property is admissible at the discretion of the trial court.

3. EMINENT DOMAIN — JUST COMPENSATION — EVIDENCE — FAIR MARKET VALUE — POSTTAKING COMPARABLE SALES.

Evidence concerning comparable sales that took place within a reasonable time of a taking may be admitted to establish fair market value at the discretion of the trial court.

*Williams Acosta, PLLC* (by *Avery K. Williams* and *Ruben Acosta*), for the city of Detroit.

*Steinhardt Pesick & Cohen, Professional Corporation* (by *Jerome P. Pesick, H. Adam Cohen,* and *Jason C. Long*), for Detroit Plaza Limited Partnership.

Before: WHITBECK, C.J., and HOEKSTRA and KELLY, JJ.

HOEKSTRA, J. In this action to determine just compensation for property condemned under the provisions of the Uniform Condemnation Procedures Act (UCPA), MCL 213.51 *et seq.*, plaintiff City of Detroit (the City) appeals as of right a judgment, entered following a jury verdict, requiring it to pay defendant Detroit Plaza Limited Partnership (DPLP) just compensation in the amount of $25 million. The City also challenges the trial court's order fully reimbursing DPLP for its attorney and expert fees. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

This case arises from efforts by the City to jump-start redevelopment of an area of Detroit known as "Rivertown." According to the City, although located just east of its burgeoning central business district (CBD), sustainable commercial development of this substantially industrial area had for years been hampered by cement-batching operations located along the neighborhood's Detroit River frontage. In an effort to alleviate the disabling effects of these operations and reclaim the waterfront in that area, the Economic Development Corporation of the City of Detroit (EDC), in approximately 1996 or 1997, began talks with several area cement companies regarding movement of their operations to another part of Detroit. As part of these talks, the EDC entered into nonbinding agreements with the Holman and Lafarge cement companies, wherein the parties agreed to make a good-faith effort to work

toward that goal. At about that same time the EDC, through the efforts of its president and chief executive officer Beth Duncombe, began talks with two of DPLP's three general partners, James Blain and Ronald Slavik, regarding the City's purchase of a 6.3 acre parcel owned by DPLP for use as public parkland. However, when city officials announced plans to site casino-gaming operations in the Rivertown area in 1998, talks to purchase the parcel, which is located south of Atwater Street along the Detroit River immediately east of the Lafarge cement-batching operations, stalled.

Because the EDC was already working to reclaim the waterfront in the Rivertown area, the City combined its casino and waterfront plans into what became known as the Waterfront Reclamation and Casino Development Project. At the City's direction, the EDC drafted a plan for the combined project, which the City adopted on April 29, 1999, by way of a "Resolution of Necessity of the City Council of the City of Detroit for the Taking of Private Property for the Benefit and Use of the Public for the Waterfront Reclamation and Casino Development Project and other Municipal Public Purposes." This resolution defined the project area and authorized the EDC to negotiate and purchase land for the combined projects on behalf of the City. The resolution made clear, however, that the waterfront reclamation portion of the project entailed only property south of Atwater Street, which was to be used for public parkland, while development of the casinos was to be confined to property located north of Atwater.

After obtaining appraisals and environmental reports for the various properties within the project area defined by the resolution, the EDC began negotiating the purchase of the properties from the individual land

owners. According to Duncombe, the EDC was able to freely purchase some, but not all, of the desired properties. The City thus instituted condemnation proceedings against the remainder of the properties, as directed by the April 1999 resolution of necessity. Those actions were, however, dismissed for lack of subject-matter jurisdiction resulting from the failure of the City's good-faith offers to conform to the requirements of the UCPA. Rather than institute new actions following the dismissal, the City returned to the process of acquiring the remaining properties through negotiated purchases. When attempts to purchase the subject property failed, the City filed the instant suit for condemnation of the DPLP parcel on September 21, 2000.

Although it initially challenged the necessity of the taking, DPLP ultimately withdrew that challenge, and the matter proceeded to trial on the issue of just compensation. The City's expert appraiser, Thomas Walsh, testified at trial that the parcel held a fair market value of approximately $50 per square foot, or $13,712,500, on the date of valuation. In support of his valuation, Walsh indicated that he believed the cement operations and poor infrastructure in the area rendered development of the property on the date of valuation, i.e., September 21, 2000, infeasible, and that because the area surrounding the subject property was largely industrial, with many vacant and dilapidated buildings and worn streets, the "highest and best use of the property [was as] investment land for future development." Walsh further testified that in order to get the "same neighborhood effect," he limited his search for comparable sales on which to base his valuation to properties located in the Rivertown area, which he defined as the area east of the Renaissance Center to the Belle Isle Bridge.

In contrast, DPLP's expert appraiser, David Burgoyne, testified that he was not at all concerned about the cement operations in the Rivertown area, including those conducted by the Lafarge cement company immediately next door to the subject property. Rather, Burgoyne testified that given its riverfront location just two blocks east of the Renaissance Center on the edge of the CBD, and its inclusion within the City's Downtown Development District (DDD), the highest and best use of the DPLP property as of September 21, 2000, "was for a major mixed use development that would take advantage of the subject location close to the Renaissance in the DDA [sic] and particularly on the river."

Burgoyne determined the value of the subject property to be $115 per square foot, for a total parcel valuation of $31.5 million, which he explained was "[b]ased upon the fact that the property has substantial river frontage, located in the downtown development authority, zoned for major development, located in the shadow of the Renaissance two blocks away, [and] has adequate size for major development without a need for assemblage . . . ." Regarding the comparable sales he used in reaching his valuation, Burgoyne testified that because of the "uniqueness of [the subject property's] specific location," including its position within the DDD, he believed it was necessary to consider more than just the specific neighborhood in which the property is located. Thus, unlike Walsh, he looked to the "immediately surrounding CBD and downtown" for comparable sales on which to base his valuation of the subject property.

Burgoyne further testified that after reaching his conclusion regarding value, he found other transactions that provided support for his valuation of $115 per square foot. Regarding these transactions, which Bur-

goyne described as "confirming sales," Burgoyne explained that the

> [C]ity purchased some additional property shortly after the date of valuation in the vicinity of the subject property largely to the east of the subject property in Rivertown. At the time there . . . originally had been a condemnation lawsuit which had been dismissed and the [C]ity was purchasing property consistent with the designated casino site being in the eastern or front end river town; these sales were made outside of the context of the condemnation lawsuit . . . .

*   *   *

> . . . and were purchased by the city of Detroit in the close vicinity of the subject property albeit for casinos.

Burgoyne testified that he considered several of these sales, all of which occurred in the Rivertown area during the spring or summer of 2001, as supportive of his $115 per square foot valuation. Burgoyne further testified that the City also paid $100 per square foot for the eight-acre Lafarge property located immediately to the west of the subject property, in addition to agreeing that Lafarge would be given another city-owned parcel further south in an industrial area of the Detroit riverfront, on which to relocate its batching operations.

At the close of trial, the jury determined the fair market value of the property on September 21, 2000, to be $25 million, on which the trial court entered judgment. DPLP thereafter successfully moved to recover the attorney and expert fees incurred by it in defending the condemnation suit. This appeal followed.

II. ANALYSIS

A. EVIDENTIARY ISSUES

The City challenges as erroneous a number of the trial court's rulings regarding the evidence admissible

in this matter on the question of just compensation. In resolving these challenges on appeal, we adhere to the following principles of law generally applicable to condemnation cases.

When the government takes private property pursuant to its constitutional power of eminent domain, see Const 1963, art 10, § 2, it must do so for a public use and must pay to the property owner just compensation—an amount that "takes into account all factors relevant to [the] market value" of that property. *Silver Creek Drain Dist v Extrusions Div, Inc*, 468 Mich 367, 373-374, 378-379; 663 NW2d 436 (2003). The goal of just compensation is to require the condemning agency to pay the approximate price that a willing buyer would have offered for the property at the time of the taking, *Dep't of Transportation v Haggerty Corridor Partners Ltd Partnership*, 473 Mich 124, 142; 700 NW2d 380 (2005), thereby placing property owners "in as good a position as they would have been in had their property not been taken from them," *Miller Bros v Dep't of Natural Resources*, 203 Mich App 674, 685; 513 NW2d 217 (1994); see also *Poirier v Grand Blanc Twp (After Remand)*, 192 Mich App 539, 543; 481 NW2d 762 (1992). Thus, our Supreme Court has held that the determination of just compensation requires that "all factors relevant to market value" be taken into account. *Silver Creek*, *supra* at 379. There is, however, "no formula or artificial measure of damages applicable to all condemnation cases." *Poirier*, *supra* (internal quotation marks omitted). Rather, the amount to be recovered by the property owner is generally left to the trier of fact, as a matter of " 'sound judgment and discretion based upon a consideration of all the relevant facts in a particular case.' " *Dep't of Transportation v Frankenlust Lutheran Congregation*, 269 Mich App 570, 577; 711 NW2d 453 (2006), quoting *In re Widening of*

*Michigan Ave*, 280 Mich 539, 548; 273 NW 798 (1937). The decision concerning the evidence properly admissible on the question is, however, a matter left to the discretion of the trial court, and will not be reversed on appeal absent an abuse of that discretion. *Frankenlust, supra* at 575. A trial court abuses its discretion in admitting or excluding evidence if its determination falls beyond the principled range of outcomes. See *Dykema Gossett, PLLC v Ajluni*, 273 Mich App 1, 15; ___ NW2d ___ (2006).

### 1. LIKE-KIND EXCHANGE

The City first argues that the trial court erred in excluding evidence regarding a 1996 sale of riverfront property located directly adjacent to the subject property. We disagree.

Before trial, DPLP moved in limine to exclude evidence of the sale and purchase of approximately 24 acres of riverfront property located between the subject property and the Renaissance Center, which had been used by Walsh as a comparable parcel in his appraisal. The property at issue consisted primarily of parking areas owned by the Ford Motor Company (Ford) along the river front, just east of the Renaissance Center and west of the subject property, south of Atwater Street. At a hearing on DPLP's motion, counsel for DPLP explained that the property was not included in the 1996 sale of the Renaissance Center by Ford to General Motors Corporation (GM), but because the property was subject to long-term leases that were extremely favorable to the tenants of the Renaissance Center, Ford could nonetheless effectively sell these properties only to GM. Counsel further indicated that Ford was concerned about the tax ramifications of selling this property because it had an extremely low cost basis. There-

fore, in order to minimize Ford's tax obligation, the parties agreed that GM would pay what the option agreement governing the sale termed as a "nominal purchase price" of $1,219,207, or approximately $28 per square foot, for the property. Rather than pay cash, however, the parties agreed that GM would acquire other properties suitable for future use by Ford as dealerships, which GM would then exchange for an equal amount of the parking property until it had acquired the entire 24 acres. Counsel explained that by engaging in this noncash, like-kind exchange of property, Ford was able to take advantage of § 1031 of the Internal Revenue Code, 26 USC 1 *et seq.*, which renders like-kind exchanges of properties tax-free transactions.[1] Asserting that the "nominal purchase price" set forth in the parties' option agreement was not arrived at by any formal appraisal of the property, but was rather simply agreed to by the parties in order to effectuate the tax-free exchange, counsel argued that there was no evidence that the $28 per square foot purchase price "had anything to do with market value or appraised value." Thus, noting that courts in other jurisdictions have "refused evidence of like-kind exchanges to prove the value of property," counsel argued that the transaction at issue should be excluded from evidence at trial. See, e.g., *Morgan v State*, 343 SW2d 738, 741 (Tex

---

[1] Pursuant to 26 USC 1031(a)(1),

> [n]o gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment.

Thus, when like-kind properties are exchanged, each property's cost basis is considered to have carried over to the other and neither a gain nor a loss is recognized on the transaction for purposes of income taxation.

Civ App, 1961) (the admission of evidence of a like-kind exchange of land is not "a proper method of arriving at market value of condemned land, even though evidence might be tendered as to the value of the land offered in trade"); see also *Homer v Dadeland Shopping Ctr*, 229 So 2d 834, 838 (Fla, 1969) ("[t]o render evidence of voluntary sales competent [to prove market value] they must be for money and not, in whole or in part, by way of exchange"). Counsel further argued that the fact of the sale at $28 per square foot should be excluded from evidence at trial because its admission would be unfairly prejudicial and, to be properly presented, would require the introduction of evidence regarding the legal and tax considerations attendant to the transaction, which would likely confuse or mislead the jury.

In response, counsel for the City argued that to label the sale a mere "property exchange" was a mischaracterization of the transaction. Counsel asserted that although the transaction was consummated by an exchange of land, that fact did not alter the reality that the exchange was premised on a $28 square-foot price for the Ford-owned land. As support for this assertion, counsel cited a letter from GM corporate counsel indicating, in response to a subpoena request for documents concerning the sale, that the "total consideration for the purchase of the Ford land and the termination of the leases was an amount equal to . . . approximately $28 a square foot." Counsel further noted that the representative who negotiated the purchase on behalf of GM testified at deposition that the "consideration" paid by GM for the property was $28 per square foot, and that this price was agreed to by the parties through arm's length negotiations. Counsel additionally noted that the cases relied on by DPLP for the proposition that transactions involving like-kind exchanges of prop-

erty are inadmissible on the question of market value did not involve "a negotiated cash price."

After taking the matter under advisement, the trial court granted DPLP's motion to exclude evidence of the sale at trial. On appeal, the City asserts that the trial court erred in concluding that the transaction was "simply a property exchange" and, therefore, inadmissible, and in finding the evidence to be unfairly prejudicial. We find no error in the trial court's exclusion of the sale from evidence at trial.

It does not appear that the question whether transactions involving the exchange of property are admissible as evidence of market value has been addressed by any Michigan court. However, regardless of whether such transactions are admissible as evidence in condemnation proceedings initiated in this state, and contrary to the City's assertion on appeal, the trial court did not exclude the challenged evidence on the ground that the sale was "simply a property exchange" and, therefore, inadmissible. Nor did the court rule, as asserted by the City, that evidence of the transaction was unfairly prejudicial to DPLP. Rather, the trial court found that, although arguably relevant to the question of just compensation, the probative value of the evidence was substantially outweighed by the danger of unavoidable confusion of the issues and misleading of the jury. We find no error in the trial court's conclusion in this regard.

Pursuant to MRE 403, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Here, it is not disputed that, although the option agreement governing

the transaction at issue set forth a "nominal purchase price" of $28 per square foot, no cash was in fact exchanged between the parties; rather, only property was exchanged. Thus, as noted by the trial court, use of the transaction as evidence of the subject property's fair market value would require deliberation and decision on a number of issues collateral to that matter, including, among other things, the tax motivations of a like-kind exchange; the extent, if any, to which Ford's prior ownership of the Renaissance Center and associated parking leases for the property affected the salability of the property to anyone other than GM; the value of each parcel exchanged between the parties; and the financial benefits Ford obtained from receipt of new lands in exchange for the parking property. Clearly the introduction of such evidence "would have a tendency to divert the trier of fact's attention from the truly significant issues in the case," see Robinson, Longhofer & Ankers, Michigan Court Rules Practice, Evidence, § 403.4, p 304, and, as such, was properly excluded by the trial court. See also Dubin, Weissenberger & Stephani, Michigan Evidence Courtroom Manual (2006 ed), Chapter 403, p 77 ("[e]xclusion based upon confusion is usually justified where the offered evidence would require the trier of fact to engage in intricate, extraordinary, or impossible mental gymnastics in order to comprehend the import of the evidence or to evaluate its weight"). Consequently, on the facts of this case, we are not persuaded that the trial court abused its discretion in excluding evidence of the sale at trial. *Dykema Gossett, PLLC, supra; Frankenlust, supra.*

### 2. PROJECT-RELATED SALES

The City next argues that the trial court erred in failing to exclude evidence of the "project-related" sales

that Burgoyne used to confirm his valuation, but which were located within the "project area" as defined by the city council's resolution of necessity.[2] Relying on the general rule that an award of just compensation may not include any increase or decrease in value resulting from the condemnation project itself, and noting that each of the four properties at issue were sold to the City in lieu of condemnation proceedings, the City moved before trial to exclude evidence of these sales.[3] The City argued that speculation regarding casino placement in the Rivertown area had inflated the value of these properties, thereby precluding their consideration by the jury under the "scope of the project" rule. The City also argued that sales made under a threat of condemnation are, by definition, not a sale between a willing buyer and a willing seller, and were thus not a true indicator of the property's market value. In support of this latter argument, the City asserted that the fact that condemnation suits against these properties had been dismissed and were never reinstated was not relevant to the question of the admissibility of the sales, as "[t]he fact of the matter is . . . these properties were acquired by the City for the project under threat of condemnation" pursuant to a resolution of necessity.

In response, DPLP argued that the properties at issue were not part of the same project, as the City sought to condemn the subject property for use as a

---

[2] As defined by the resolution, the "project area consist[ed] of approximately 137 acres generally bounded by Rivard and Riopelle on the west, Chene on the east, the Detroit River harbor line on the south, and East Jefferson on the north . . . ." As previously noted, however, the uses to which this area was to be put were expressly divided between public parkland along the river and inland casino siting.

[3] On appeal, the City appears to assert also that evidence pertaining to the City's purchase of the Lafarge cement company parcel was inadmissible for these same reasons.

park, rather than in connection with casino siting.[4] Noting that the City chose to negotiate purchase of the properties rather than reinstate condemnation proceedings against the parcels, DPLP further argued that, although involving a sale to an entity with the power of eminent domain, the City's challenge to the legitimacy of these sales was a matter of the weight to be accorded the evidence, rather than its admissibility.

Following these arguments, the trial court denied the City's motion to exclude evidence of the sales.[5] On appeal, the City challenges the trial court's decision in this regard on several grounds.

### a. SCOPE OF THE PROJECT RULE

The City first argues that evidence of the sales were precluded by the "scope of the project" rule, as set forth in MCL 213.70, and that the trial court therefore erred in failing to exclude the sales. We disagree.

This Court reviews a trial court's decision to admit evidence for an abuse of discretion; however, when the trial court's decision involves a preliminary question of law, such as whether a statute precludes the admission

---

[4] Contrary to defendant's assertion, the record does not support the proposition that all of these purchases were made by the City in connection with the casino siting portion of the project. As Duncombe testified at trial, the city counsel's resolution of necessity made clear that the waterfront reclamation portion of the project entailed only property south of Atwater Street, which was to be used for public parkland, while development of the casinos was to be confined to property north of Atwater Street. Of the properties at issue here, both the Holman and Lafarge properties are located south of Atwater Street and were thus arguably part of the parkland project of which the subject property was a part.

[5] In denying the motion, the trial court relied on its reasoning in an earlier case before it, i.e., "the Pinnacle case." The basis for that reasoning, however, has not been presented to this Court and is not apparent from the record presented on appeal.

of evidence, a de novo standard of review is employed. *Frankenlust, supra* at 575. When interpreting a statute, this Court's goal is to ascertain and give effect to the intent of the Legislature by enforcing plain language as it is written. *Id.*

We initially note that, contrary to the City's assertion, MCL 213.70 does not fully embody the "scope of the project" rule, which, as first announced by the United States Supreme Court in *United States v Miller*, 317 US 369; 63 S Ct 276; 87 L Ed 336 (1943), provides a means to determine whether property taken after the initiation of a government improvement project was within the scope of the project from its inception. Pursuant to the rule,

> [i]f [the subject lands] were within the area where they were likely to be taken for the project, but might not be, the owners [are] not entitled, if they were ultimately taken, to an increment of value calculated on the theory that if they had not been taken they would have been more valuable by reason of their proximity to the land taken. [*Id.* at 379.]

We further note that our own Supreme Court has not yet expressly addressed the applicability of the scope of the project rule, as announced in *Miller*, within this state. We agree, nonetheless, that the concerns regarding the effect of a public improvement project on the fair market value of condemned land are reflected in MCL 213.70.[6] We conclude, however, that while recognizing that the market value of property condemned can be affected, adversely or favorably, by the immi-

---

[6] MCL 213.70 provides, in relevant part:

(1) A change in the fair market value before the date of the filing of the complaint which the agency or the owner establishes was substantially due to the general knowledge of the imminence of the acquiring by the agency, other than that due to physical deterioration of the property within the reasonable control of the

nence of the very public project that makes the condemnation necessary, and that to permit compensation to be either reduced or increased because of an alteration in market value attributable to the project itself would not lead to the "just compensation" constitutionally required, nothing in the plain language of MCL 213.70 indicates that the Legislature intended to preclude admission of evidence reflecting noncompensable project enhancement. Rather, the plain language of the statute commands only that any effect on value attributable to the government's special demand and its actions as condemnor be excluded from compensation. See 3 Nichols, Eminent Domain (3d ed), § 8A.01[10], p 8A-21 ("[t]he majority rule excluding enhanced value does not necessarily exclude *evidence* of enhancement; it merely excludes *compensation* for increased value attributable to anticipation of the proposed project") (emphasis added). Thus, we reject the City's assertion that the limitation on compensation found in MCL 213.70 required that the trial court exclude the sales at issue from admission into evidence at trial.

To exclude the sales at issue on the ground that they may reflect a noncompensable element of value is not only inconsistent with the plain language of MCL 213.70, but also the "liberal manner in which evidence in condemnation cases has traditionally been received in Michigan." *Frankenlust, supra* at 584, citing *Grand Rapids v HR Terryberry Co*, 122 Mich App 750, 755; 333

---

owner, shall be disregarded in determining fair market value. . . . [T]he property shall be valued in all cases as though the acquisition had not been contemplated.

(2) The general effects of a project for which property is taken, whether actual or anticipated, that in varying degrees are experienced by the general public or by property owners from whom no property is taken, shall not be considered in determining just compensation.

NW2d 123 (1983). Indeed, as argued by DPLP, the model jury instruction regarding the effect of a proposed public improvement, with which the jury in this case was charged, presupposes that such evidence will be admitted and itself indicates that the question whether, and if so to what extent, a property's value has been enhanced by a condemnation project is a factual question to be deliberated on and decided by the trier of fact. See M Civ JI 90.15.

Because to exclude the sales at issue on the ground that they may reflect a noncompensable element of value is not consistent with the plain language of MCL 213.70, the liberal manner in which evidence in condemnation cases has traditionally been received in this state, and the clear directive of the jury in determining just compensation as found in M Civ JI 90.15, we find no error in the trial court's ruling admitting such evidence at trial. We note, however, that in so finding we do not hold that sales within a condemnation project area are admissible as a matter of course. As with all evidence, considerations of relevance and undue prejudice may themselves require that such evidence be excluded. Such determinations remain within the discretion of the trial court upon consideration of the circumstances presented in a particular case. See MRE 401 and 403. We are not here presented with such questions and hold only that MCL 213.70 does not command that evidence of value attributable to the special demands of the government and its actions as condemnor be excluded from a trial on the question of just compensation, but rather only that such value be excluded from the compensation ultimately awarded.

### b. SALES TO CONDEMNOR

We similarly reject the City's assertion that the challenged evidence was inadmissible solely on the

ground that the sales at issue were made to a condemnor. As acknowledged by DPLP, a majority of jurisdictions holds that evidence of sales prices where one party to the transaction possessed the power to condemn is irrelevant to market value because of the threat of ultimate litigation present during the negotiations.[7] The policy behind this exclusion is that the prices so paid are neither more nor less than a compromise of litigation, present or prospective, rather than a price paid by a willing buyer to a willing seller, neither of whom acts under any compulsion other than the circumstances of the marketplace. See, e.g., *Metropolitan Street R Co v Walsh*, 197 Mo 392, 405-408; 94 SW 860 (1906).[8]

Other jurisdictions, however, have recognized that purchases by public bodies are not inevitably tainted with threats of compulsion. For example, in *Honolulu*

---

[7] See 85 ALR2d 110 § 10, p 163, and cases cited therein:

In a majority of the cases in which the question has arisen, courts have held that evidence as to the price paid by the same or another condemning agency for other real property which, although subject to condemnation, was sold by the owner without the intervention of eminent domain proceedings, is rendered inadmissible to prove the value of the real property involved merely because the property was sold to a prospective condemnor.

[8] In *Metropolitan Street R Co*, *supra* at 405, the Missouri Supreme Court explained the justification for this blanket rule of exclusion as follows:

"Such sales are not a fair criterion of value, for the reason that they are in the nature of a compromise. They are affected by an element which does not enter into similar transactions made in the ordinary course of business. . . . The fear of one party or the other to take the risk of legal proceedings ordinarily results in the one party paying more or the other taking less than is considered to be the fair market value of the property." [*Id.*, quoting 2 Lewis, Eminent Domain (2d ed), § 447.]

*Redevelopment Agency v Pun Gun*, 49 Haw 640; 426
P2d 324 (1967), the Hawaii Supreme Court, while
recognizing that a majority of courts deems evidence of
sales to the condemnor of land earmarked for condem-
nation inadmissible to substantiate market value be-
cause such sales "are almost always in the nature of a
compromise," *id.* at 641, determined that "the better
view [is] that such evidence should not be automatically
excluded as a matter of law." *Id.* at 642. In so deciding,
the court reasoned:

> "Almost all sales . . . are necessarily influenced, on one
> side or the other by considerations outside of the fair
> market value of the property. Either the seller is influenced
> by the circumstances of his affairs, which make it desirable
> for him to sell even at some sacrifice, or else he thinks he is
> getting more for his property than its real worth; and, on
> the other hand, the purchaser has some special need or use
> for the property which makes it more valuable to him than
> to others not having such need, or else he thinks he is
> buying at less than the property is really worth. If the sale,
> as here, takes place between parties, one of whom has the
> power to condemn, it may likewise be that the seller or the
> buyer, and possibly both, are influenced by other consider-
> ations as well as by what they think is the fair market value
> of the property. The seller may think that if he does not sell
> amicably he will be put to the expense of being properly
> represented at the condemnation proceedings; but, on the
> other hand, he doubtless weighs against this the fact that a
> jury is very apt to give a liberal market value for properties
> taken under condemnation for the very reason that the
> owner is being compelled to sell against his will. The
> purchaser, on the other hand, knowing that what the law
> requires him to pay is at least fair value, and knowing that
> a jury is inclined to construe this as meaning a value
> particularly 'fair' to the man who sells against his will, may
> also be somewhat influenced. But, in the absence of ex-
> traordinary circumstances, we are unable to see, as a
> general rule, why private sales to parties having the right
> to condemn do not come quite as near representing in their

results true market value as do such sales made between parties, neither of whom have this power. It is easy enough to imagine special circumstances, falling in each class, where the result in the price obtained is, because of such special circumstances, so clearly abnormal as to destroy the similarity which must exist in order that the evidence shall be admissible. In other cases where the special circumstances are not of sufficient importance to produce this result, they may nevertheless affect the weight of the evidence, and be used for that purpose before a jury. This is so whether the purchaser is or is not a party having the power to condemn." [*Id*. at 645-646, quoting *Curley v Mayor and Aldermen of Jersey City*, 83 NJL 760, 760-762; 85 A 197 (1912).]

In further response to the suggestion that "compulsion, coercion, or compromise" is inherent in such sales, the court noted that the power of condemnation is not regarded invariably as a "club" held by government, but is perceived also as a "defense against extortion" by government. *Pun Gun, supra* at 644 n 3. Thus, the court concluded that "[t]he admissibility of such evidence as to its probative value weighed against elements of compulsion, coercion, or compromise [should be] left to the trial court in its discretion so that the jury may be placed in the best position to pass upon the ultimate question of fact," and that, therefore, "evidence of other sales to a condemnor used in support of an expert witness' opinion is admissible in the discretion of the trial court." *Id*. at 644-645, 647.

Although representative of the minority view of this matter, the reasoning in *Pun Gun* is consistent with the liberal standards for the admissibility of evidence applied in Michigan, *Frankenlust, supra*, including that the determination of just compensation requires that "all factors relevant to market value" be taken into account, *Silver Creek Drain Dist, supra* at 379. Accordingly, we adopt the views expressed by the court in *Pun*

*Gun*, and find no error in the trial court's ruling admitting such evidence at trial.

## c. AFTER-DATE-OF-VALUATION SALES

Arguing that because just compensation for property taken under the provisions of the UCPA is to be determined only by consideration of the condition of the property and the state of the market on the date of valuation, the City additionally asserts that the sales at issue were inadmissible as having occurred after the applicable date of valuation.[9] This argument, however, was recently rejected by a panel of this Court in *Detroit/Wayne Co Stadium Auth v Drinkwater, Taylor & Merrill, Inc*, 267 Mich App 625, 705 NW2d 549 (2005). There, in affirming the trial court's ruling "that evidence of posttaking comparable sales and valuation could be used to impeach witnesses and to confirm an expert's valuation as of the date of taking," *id.* at 646 n 13, the panel held that " '[w]here evidence of a comparable sale or lease is offered, the trial judge may, in his discretion, admit or exclude it considering such factors as time of the transaction, size, shape and character of the comparable land, and whether there has been any enhancement or depression in value.' " *Id.* at 649, quoting *State v Heirs of Halemano Kapahi*, 48 Hawaii 101, 112-113; 395 P2d 932 (1964). In so holding, the panel adopted as "logical and persuasive and not inconsistent with Michigan law" the holding in *Heirs of Halemano Kapahi, supra* at 113, that " '[t]he weight to be given such evidence is for the jury,' " and that the determination whether the sale was too remote in time

---

[9] See MCL 213.70(3), which provides, in relevant part that "[t]he value of each parcel . . . shall be determined with respect to the condition of the property and the state of the market on the date of valuation."

is a matter within the discretion of the trial court. See *Detroit/Wayne Co Stadium Auth*, *supra* at 649. Here, the sales at issue each occurred within one year of the date of valuation and, as noted by the court in *Heirs of Halemano Kapahi*, *supra* at 111, " '[i]n the usual run of cases, a sale within a year is admitted as a matter of course.' " *Detroit/Wayne Co Stadium Auth*, *supra* at 648. Accordingly, we reject the City's assertion that the trial court abused its discretion or otherwise erred in admitting the challenged evidence because the sales at issue occurred after the date of valuation applicable to the subject property.

### 3. PARTNERSHIP DISPUTES

The City next asserts that the trial court erroneously excluded evidence of certain disputes among the partners of DPLP regarding the subject property. Again, we disagree.

Before trial, DPLP moved in limine to exclude evidence of disputes among its partners regarding, among other things, "who and what it took to be able to sell the property." In doing so, DPLP argued that the sole issue to be decided at trial was the fair market value of the property and that, while any evidence tending to affect market value is generally admissible for purposes of determining just compensation, evidence "relating to the disputes between these partners" in no way bore upon the property's market value on the date of valuation. The disputes included a 1997 action for breach of fiduciary duties and damages brought by the third DPLP partner, Beztak II Limited Partnership (Beztak), against Blain, Slavik, and several others, arising from a failed deal to develop the property for riverboat or other gaming purposes, and a 1998 declaratory action, filed by Blain and Slavik against Beztak, seeking a declaration

of the partners' authority to negotiate and agree to sell the property to the City. DPLP argued that neither of the suits had anything to do with market value, and both were thus not relevant to the proceedings, and that, even if relevant, evidence of the disputes was more prejudicial than probative and would serve only to confuse or mislead the jurors while unduly wasting trial time with evidence of collateral matters.

In response, the City surmised that as support for its $31.5 million valuation of the property, DPLP would place its partners before the jury at trial to discuss the partnership's various past proposals for developing the property. Thus, the City argued, "the reality of what they went through as a partnership [is] relevant if they are going to take the stand and talk about these plans and use that as a basis for value."

On appeal, the City argues that the trial court abused its discretion in subsequently ruling that the evidence was "too far afield" of the issue to be decided by the jury and would thus be excluded as irrelevant unless "a door was opened" at trial. We do not agree. As previously noted, the decision to admit or exclude evidence is committed to the discretion of the trial court and will not be reversed on appeal unless its determination falls beyond the principled range of outcomes. *Dykema Gossett, PLLC, supra*; see also *Frankenlust, supra* at 575. We find no such abuse of the trial court's discretion.

The City correctly asserts that for purposes of condemnation valuation, all evidence tending to affect market value is relevant. *Silver Creek Drain Dist, supra* at 378-379. However, the fact that disputes between the partners may have been a factor in the partnership's failure to develop the property before the taking is simply not relevant to the property's fair market value on the date of valuation. Indeed, in challenging the

motion in limine below, the City acknowledged that the highest and best use determination, which provides the basis for valuation of condemned property, requires simply that the use be legally permissible, financially feasible, maximally productive, and physically possible. See *Detroit/Wayne Co Stadium Auth*, *supra* at 633 (highest and best use of the property means " 'the most profitable and advantageous use the owner may make of the property even if the property is presently used for a different purpose or is vacant, so long as there is a market demand for such use,' " quoting M Civ JI 90.09). Because any disputes regarding partner authority to act on behalf of the partnership, or whether the partners breached fiduciary duties to one another, are irrelevant to such determination, the trial court did not abuse its discretion in excluding evidence of such disputes, absent the "opening of a door" at trial. *Dykema Gossett, PLLC*, *supra* at 15. Indeed, property valuation based on a highest and best use determination does not require that the property owner would have in fact put the property to such use. See *Detroit/Wayne Co Stadium Auth*, *supra* at 633. Rather, as the City acknowledged, such valuation requires only that the use on which the valuation is made be legally permissible, financially feasible, maximally productive, and physically possible.

In any event, the City has failed to show that the exclusion of evidence of partner disputes regarding the proposed projects and the authority of individual partners to authorize or impede acts of the partnership adversely affected the jury's determination of the market value of the subject property. See *Three Lakes Ass'n v Whiting*, 75 Mich App 564, 579; 255 NW2d 686 (1977) (it is an appellant's burden to establish error requiring relief on appeal). Indeed, the City's purported purpose for placing this evidence before the jury was to show the fact of the disputes as those related to the viability of

the proposed developments. However, although each of the partners offered testimony regarding the partnership's plans for development of the property, DPLP did not present such evidence as a basis for its valuation. In fact, DPLP's appraisal expert, David Burgoyne, specifically testified that while he familiarized himself with the various development ideas in conducting his valuation, he did not inquire into the feasibility or otherwise concern himself with the various project proposals because condemnation valuation must be based on the highest and best use of the condemned property on the date of valuation, regardless of past or current use.

Moreover, the City was, to a large extent, successful in showing that the partnership's development plans were either legally or economically infeasible, or amounted to no more than an idea that failed to move past the initial stages of planning. Indeed, each of the partners acknowledged during their testimony at trial that the development plans considered by the partnership since having acquired the property failed for various legal or economic reasons. Thus, even were it error to exclude the challenged evidence, such error was harmless. MCR 2.613(A). The City has, therefore, failed to establish error requiring relief on appeal. *Id.*; *Three Lakes Ass'n, supra* at 579.

#### 4. OFFER TO SELL

The City next argues that the trial court erred in also excluding evidence of an alleged offer to sell the property. As explained below, we again find no abuse of discretion in the trial court's decision in this regard.

Before trial, DPLP moved in limine to exclude evidence of a "negotiated offer" purportedly made by Blain and acceded to by Slavik to sell the subject property to the City in 1997 at a price of $7.5 million. The City's

appraiser, Thomas Walsh, used this offer as a comparable sale in reaching his valuation. DPLP argued, however, that the oral nature of the alleged offer, which had purportedly been made to Duncombe by Blain but was never placed in writing, rendered it "too uncertain, too shadowy, [and] too speculative to rely upon [in] determining value of [the] land" and should, therefore, be excluded from evidence at trial. As support for this assertion, DPLP noted that while Walsh indicated at deposition that he received the $7.5 million figure that he relied on in his appraisal from Duncombe, Duncombe testified at deposition that the parties had orally agreed to an $8.5 million sale price, while Blain, on the other hand, testified that, although the parties had discussed a range between $8 million and $10 million, no price was ever agreed upon by the parties for sale of the property.

The City, asserting that Blain and Slavik "went so far as to file a lawsuit" in order to effectuate a sale of the property to the City, argued in response that the offer was neither shadowy nor speculative, but rather an admission by DPLP concerning the fair market value of property arrived at through negotiations. The trial court, however, granted DPLP's motion to exclude evidence of the alleged "negotiated offer," stating:

> I am going to grant this motion for two reasons. One, it kind of dovetails with the first motion, gets into the area of potential partnership disputes.
>
> And secondly, [MRE] 403 grounds, there isn't even a sum certain, an amount agreed upon. So, we could end up spending an amount of time trying to resolve that issue with the jury that sidetracks us, leads to confusion, unnecessary delays. So, I am going to grant the motion.

Thus, although permitted to present evidence of the 1997 negotiations for a sale of the property to the City,

the City was precluded from presenting evidence regarding any amount allegedly agreed to by the parties at trial.

On appeal, the City challenges the trial court's decision to preclude such testimony as an abuse of discretion warranting a new trial. In doing so, the City argues that unwritten offers for the purchase or sale of property, if they are shown to be bona fide, are recognized as competent comparable market transactions for purposes of condemnation valuation, and that here, the negotiated nature of the offer in combination with the filing of suit "to compel the sale of the subject property to the city" establishes that the "negotiated offer" was a bona fide offer on which Walsh could properly rely for purposes of valuation. See, e.g., *Kalamazoo v Balkema,* 252 Mich 308, 312-313; 233 NW 325 (1930) (to establish market value of property by offer in condemnation proceeding, one must at least show that there has been a bona fide offer). As indicated above, however, the trial court did not preclude the challenged evidence on the ground that it was substantively inadmissible. Rather, the court concluded that the breadth of litigation necessitated by the absence of a consensus among the witnesses with respect to the amount, if any, agreed on by the parties could "sidetrack" or otherwise confuse the jury with regard to the issues and unnecessarily delay the trial. In response to this rationale, the City asserts only that evidence of a comparable market transaction was "highly probative" of the development of Walsh's expert opinion regarding value, and that evidence of the alleged "negotiated offer" at issue here "would no more mislead or confuse the jury than would testimony of a sale or any other market transaction evidence relied upon by a witness in coming to an opinion of value." We disagree.

It is not disputed that no written agreement to sell the property at a stated price was ever executed, or even fully drafted, by the parties. There is also no dispute that deposition testimony concerning the extent and result of the parties' negotiations for the sale of property was varied. Moreover, contrary to the City's assertion on appeal, the suit for declaratory relief initiated by Blain and Slavik sought only a declaration that two of the three DPLP partners could, under the terms of the partnership agreement, enter into a valid agreement to sell the property. Although the complaint seeking this declaration acknowledged that the City partners were engaged in negotiations with the City for such a sale, and while the declaration sought would have permitted such a sale to the City, the suit was not, as the City asserts, a suit to compel sale of the property to it for an established price. Thus, there was clearly a number of questions regarding whether and to what extent an agreement for sale of the property was reached by the parties. Given these questions and the extensive and varied testimony necessary to resolve them, the trial court's decision to exclude the evidence on the ground that the probative value of the challenged evidence was substantially outweighed by the danger that it might confuse the jurors and unnecessarily delay or otherwise prolong the trial was within the principled range of outcomes. *Dykema Gossett, PLLC, supra* at 15. The trial court did not, therefore, abuse its discretion in precluding evidence of the alleged negotiated offer at trial. *Frankenlust, supra* at 575.

### 5. EXPERT REDIRECT EXAMINATION

The City next argues that the trial court erred in limiting the testimony of expert witness Lawrence Golicz on redirect examination. Again, we disagree.

Golicz, a licensed real estate appraiser, was called by the City to testify regarding an appraisal of the subject property that he completed during the City's talks with Blain and Slavik regarding purchase of the property for use as parkland. During cross-examination Golicz acknowledged that because he was retained by the Department of Natural Resources, which was to provide grant monies for the purchase by the City, to conduct an "acquisition appraisal" of the subject property, he did not apply the definition of market value used when valuing property for purposes of condemnation and, therefore, his 1996 appraisal and 1997 update, valuing the property at $4.4 million and $6.7 million, respectively, did not reflect the highest price possible for the subject property. Golicz also acknowledged that the comparable parcels used in his 1996 appraisal each held an industrial, as opposed to planned-development, zoning classification at the time of his appraisals. After Golicz was reminded of these acknowledgments, counsel for the City attempted to question Golicz regarding whether his valuation would have been any different if he had been conducting a condemnation, as opposed to an acquisition, appraisal. The trial court sustained an objection by the defense to such testimony, and also prevented Golicz from providing testimony regarding whether he considered the reasonable likelihood of a zoning change for the property when conducting his appraisal and update.

The City asserts on appeal that the trial court erred in so limiting Golicz's testimony. In doing so, the City appears to argue that because the information sought to be elicited on redirect examination "was in response to direct questions raised by [DPLP] on cross-examination," it was entitled to inquire into those matters. The City also asserts that by preventing it

from eliciting this testimony, the trial court unfairly permitted DPLP to insinuate that Golicz's appraisal was "somehow defective."

Although the City is correct that the scope of redirect examination is generally defined by the topics raised during cross-examination, see *Gallaway v Chrysler Corp*, 105 Mich App 1, 8; 306 NW2d 368 (1981), this general rule does not equate to an entitlement to elicit any and all testimony on such topics. Rather, the rules of evidence, which require that "questions concerning . . . the admissibility of evidence shall be determined by the court," continue to apply regardless of whether the questioning at issue is properly within the scope of examination. MRE 104(a). In any event, the record does not indicate that the trial court excluded the testimony at issue on the ground that it exceeded the permissible scope of redirect examination and, to the extent that the City asserts that the trial court's ruling unfairly prejudiced the City at trial, its argument is not preserved for review by this Court.

Indeed, it is well settled that in order to preserve the issue of the admissibility of evidence for appeal, the proponent of evidence excluded by the trial court must make an offer of proof. MRE 103(a)(2); see also *Phinney v Perlmutter*, 222 Mich App 513, 529; 564 NW2d 532 (1997). As noted in Robinson, Longhofer & Ankers, Michigan Court Rules Practice, Evidence, § 103.4, p 26, an offer of proof "serves the dual purpose of informing the trial court of the nature and purpose of the evidence sought to be introduced, and of providing a basis for the appellate court to decide whether to sustain the trial court's ruling." Here, the City failed at trial to make an offer of proof regarding the substance of the testimony alleged to have been improperly excluded. Consequently, this issue is not preserved for appellate review

as this Court is unable to determine whether the trial court erroneously excluded testimony that would have affected the City's substantial rights. MRE 103(a) ("[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected"); see also *Phinney, supra* at 529. Absent evidence of some harm to the City, we cannot say that the trial court's decision to limit Golicz's testimony was an abuse of its discretion. *Frankenlust, supra* at 575.

### B. ATTORNEY AND EXPERT FEES

### 1. ATTORNEY FEES

The City next argues that the trial court abused its discretion by awarding DPLP the maximum attorney fee permissible under the UCPA. We disagree. "An award of attorney fees in a condemnation case will be upheld unless the trial court abused its discretion in determining the reasonableness of the fees." *Dep't of Transportation v Curis*, 221 Mich App 136, 139-140; 561 NW2d 459 (1997).

Subsection 16(3) of the UCPA provides that a property owner is entitled to reimbursement of its reasonable attorney fees if the final compensation award is greater than the agency's good-faith written offer. MCL 213.66(3). Specifically, this subsection provides:

> If the amount finally determined to be just compensation for the property acquired exceeds the amount of the good faith written offer under [MCL 213.55], the court shall order reimbursement in whole or in part to the owner by the agency of the owner's reasonable attorney's fees, but not in excess of ⅓ of the amount by which the ultimate award exceeds the agency's written offer as defined by [MCL 213.55]. The reasonableness of the owner's attorney fees shall be determined by the court. [MCL 213.66(3).]

In *Dep't of Transportation v Randolph*, 461 Mich 757, 765; 610 NW2d 893 (2000), our Supreme Court held that the plain and unambiguous language of "[s]ubsection 16(3) mandates reimbursement 'in whole or in part' of the 'owner's *reasonable* attorney fees.' " (Emphasis added). Thus, the Court held that when confronted with a request for attorney fees under the UCPA, a trial court must first determine whether the owner's fees are reasonable, and that

> [i]n making this reasonableness determination, the trial court should consider the eight factors listed in MRPC 1.5(a).[10] If the trial court determines that the owner's attorney fees are *unreasonable*, it should utilize its discretion to determine what amount of the owner's requested attorney fees should be reimbursed by the agency.
>
> In those cases in which the trial court finds the owner's attorney fees to be *reasonable*, subsection 16(3) gives the trial court *additional* discretion to order reimbursement of those fees "in whole or in part." Once the trial court has determined the owner's attorney fees to be reasonable utilizing the factors in MRPC 1.5(a), the trial court should consider, for fee-shifting purposes and in its discretion, whether the condemning agency should be required to reimburse the entire amount of the owner's reasonable

---

[10] These factors include:

"(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent." [*Id.* at 761-762 n 7, quoting MRPC 1.5(a).]

attorney fees. The court must articulate the reasons for its decision in order to facilitate appellate review. Finally, any order of reimbursement is, of course, subject to the statutory maximum: one-third of the amount by which the ultimate award exceeds the agency's written offer. [*Id.* at 766-767 (emphasis in original).]

The City argues that the trial court abused its discretion by awarding DPLP the maximum attorney fee permissible under the UCPA. Specifically, the City asserts that DPLP failed to meet its burden of establishing the reasonableness of the fees at issue, and that the trial court erroneously "assumed that property owners are automatically entitled to a one-third attorney fee." Our review of both the evidence offered by DPLP in support of its motion for reimbursement of its attorney fees and the statements of the trial court in finding such fees to be reasonable makes clear that neither of these assertions has merit. To the contrary, the record demonstrates that the trial court considered the factors relevant to determination of the reasonableness of DPLP's attorney fees, as set forth in *Randolph, supra* at 761-762 n 7, 766-67, and, on the basis of testimony and evidence presented for its consideration, provided a "reasoned basis" for concluding that DPLP's attorney fees, and full reimbursement thereof by the City, was reasonable, *id.* at 768.

The record further demonstrates that, in reaching this conclusion, the trial court considered the foremost policy concern, initially expressed by this Court in *Dep't of Transportation v Robinson*, 193 Mich App 638, 645; 484 NW2d 777 (1992), underlying the attorney fee provision of the UCPA, i.e., that "awarding attorney fees will assure that the property owner receives the full amount of the award, placing the owner in as good a position as that occupied before the taking." Because the trial court's award was consistent with this policy

and supported by the evidence, we find that the court did not abuse its discretion in holding that reimbursement of the full one-third difference between the written offer and the ultimate award constituted reasonable attorney fees. *Id.*

### 2. EXPERT FEES

The City also asserts that the trial court erred in granting DPLP's request for reimbursement of expert fees, arguing that "[t]here was no evidence presented to demonstrate the appraisal fees in this matter are reasonable." Again, we disagree. This Court reviews for an abuse of discretion the trial court's award of expert witness fees in a condemnation action. *Dep't of Transportation v Schultz*, 201 Mich App 605, 609; 506 NW2d 904 (1993).

Like attorney fees, expert fees in an eminent domain action are governed by § 16 of the UCPA, which provides, in relevant part:

> (1) Except as provided in this section, an ordinary or expert witness in a proceeding under this act shall receive from the agency the reasonable fees and compensation provided by law for similar services in ordinary civil actions in circuit court, including the reasonable expenses for preparation and trial.

> * * *

> (5) Expert witness fees provided for in subsection (1) and this subsection shall be allowed with respect to an expert whose services were reasonably necessary to allow the owner to prepare for trial. For the purpose of subsection (1) and this subsection, for each element of compensation, each party is limited to 1 expert witness to testify on that element of compensation unless, upon showing of good cause, the court permits additional experts. The agency's liability for expert witness fees shall not be diminished or

affected by the failure of the owner to call an expert as a witness if the failure is caused by settlement or other disposition of the case or issue with which the expert is concerned. [MCL 213.66.]

This Court has previously determined that "[a]n award of reasonable expert witness fees, as determined by the trial court, is mandatory under the statute." *Hartland Twp v Kucykowicz*, 189 Mich App 591, 599; 474 NW2d 306 (1991).

During the evidentiary hearing on DPLP's motion for reimbursement of its attorney and expert fees, David Burgoyne testified regarding his experience and credentialing as a licensed real estate appraiser, and the work he performed in this case on behalf of DPLP. Burgoyne additionally provided testimony concerning his fee agreement with DPLP and the manner in which he tracked and then billed DPLP for all work performed in this matter.

Regarding the work he performed, Burgoyne testified that the instant matter presented an "extremely complicated and difficult appraisal" that required him "to dig like [he has] never done before." Burgoyne further indicated that he believed that his fee in this matter, which was premised on an hourly rate of between $175 and $200 an hour, was reasonable. Copies of Burgoyne's invoices, curriculum vitae, and fee agreement with DPLP were also presented to the trial court for consideration.

In addition to this evidence, condemnation attorneys Jerome Pesick and Boris Yakima both testified that considering the complexity of the case and "what was at risk," they believed that Burgoyne's fee was reasonable from the perspective of both hourly rate and time spent. Pesick, whose firm represented DPLP in this matter, also testified that he regularly assists his clients in

retaining experts for purposes of litigation and that he considered Burgoyne to be "one of the preeminent appraisers in the State of Michigan, if not the most preeminent." Pesick additionally indicated that he found the appraisal prepared by Burgoyne to be "outstanding," and to have "included one of the most detailed investigations of the marketplace that affected the subject property" he had ever seen. Recalling that Burgoyne had a "tremendous command" of the materials during both direct and cross-examination, Pesick indicated that Burgoyne also did a "great job" testifying at trial.

The trial court determined that the record, including Burgoyne's curriculum vitae, established that Burgoyne was in fact a "premiere [sic] condemnation appraiser in Michigan" for which an hourly rate of $175 per hour was not unreasonable. Although indicating that it was troubled by the lack of detail in Burgoyne's monthly invoices, which merely provided a statement of the hours worked during a particular month and the associated fee, the court noted that the total hours Burgoyne billed equated to approximately 23 hours a month over the course of 17 months, for what was "complex and unique appraisal work." However, finding the total hours Burgoyne worked to be reasonable when viewed in this context, the trial court awarded DPLP the entirety of Burgoyne's expert fee. The trial court's decision in this regard was within its discretion and, having support in the record, must be affirmed. Indeed, the City presented no testimony or other evidence to dispute the appropriateness of Burgoyne's fee and, although an expert is not automatically entitled to compensation for all services rendered, experts properly are compensated for court time and the time required to prepare for their testimony. *Id.* Here, contrary to the City's assertion, evidence was presented to demonstrate

that the appraisal fee was reasonable, and there was no showing that the appraisal service went beyond the scope of normal service rendered by an appraiser. We therefore hold that the trial court did not abuse its discretion in awarding DPLP the full amount of its expert witness fees.

Affirmed.