# STATE OF MICHIGAN

# COURT OF APPEALS

MICHIGAN DEPARTMENT OF
TRANSPORTATION,,

UNPUBLISHED
September 22, 2015

Plaintiff-Appellant,

v

No. 319356
Wayne Circuit Court
LC No. 11-008789-CC

PANACEA REDEVELOPMENT CORP., ELIXIR
PROPERTIES, INC., TITAN DEVELOPMENTS,
LLC, TITAN DEVELOPMENT, LLC, and
COMERICA BANK,,

Defendants-Appellees,

and

HOVARTH TOWERS, LLC, and OAKLAND
COUNTY TREASURER,

Defendants.

Before: BECKERING, P.J., and CAVANAGH and SAAD, JJ.

PER CURIAM.

In this condemnation case, plaintiff, Michigan Department of Transportation, appeals as of right the trial court's judgment granting a motion for a directed verdict in favor of defendants Panacea Redevelopment Corp., Elixir Properties, Inc., and Titan Developments, LLC,[1] awarding them $835,000 as just compensation for the partial taking of their property. The trial court granted the motion after a jury trial at which an expert for defendants Panacea, Elixir and Titan testified concerning the value of the property taken. Before trial, plaintiff and defendants Panacea, Elixir and Titan filed cross-motions in limine, both of which sought to exclude the

---

[1] Titan Development, LLC, (singular) was initially named as a separate defendant due to a misspelling of the name Titan Developments, LLC, (plural). Upon discovery of the mistake, Titan Development was voluntarily dismissed from the action. Comerica Bank defaulted before entry of the order at issue on appeal.

-1-

opposing side's respective appraisal of the property. The trial court granted defendants'[2] motion and denied plaintiff's motion. On appeal, plaintiff argues that the trial court erred in excluding plaintiff's appraisal, in declining to exclude defendants' appraisal, and in granting defendants' motion for a directed verdict. We vacate the trial court's judgment and remand for a new trial consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

### A. INITIATION OF CONDEMNATION PROCEEDINGS

This case arises from plaintiff's taking of portions of defendants' property located at 2944 Junction Avenue and 2850 Junction Avenue in Detroit, occurring on July 22, 2011. The property located at 2944 Junction Avenue, referred to as parcel one, is a 4.25-acre paved lot, triangular in shape, and enclosed by a cyclone fence. Its improvements include a security camera and an 800-square-foot modular office that houses the camera's monitoring equipment. The fence surrounding parcel one opens onto the back portion of 2850 Junction Avenue, referred to as parcel two. Parcel two is a long, narrow, 9.79-acre strip of graveled land adjacent to parcel one, running along an existing railroad line from Junction Avenue to Michigan Avenue. Parcel one is owned by Panacea and parcel two is owned by Elixir. At the time of the taking, Comerica held a mortgage on parcels one and two in the names of Panacea, Elixir and Titan. Defendants are in the business of open air trailer, truck, and shipping container storage.

Historically, defendants leased the property to two main tenants: Transport International Pool (TIP) and Hovarth Towers. TIP began leasing portions of both parcels for storage and transfer of trucks and containerized cargo in 2002. In 2008, Hovarth began leasing an area in the southeast corner of parcel two for the operation of a cellular phone tower. In early 2010, TIP terminated its lease and vacated the property. Hovarth was defendants' only tenant by the time of the taking.

On July 22, 2011, plaintiff filed a condemnation complaint to acquire 2.89 acres from parcels one and two. The area identified for condemnation included Hovarth's cellular tower. Plaintiff intended to use the property for "the improvements of the Conrail Railroad and C.N. Railroad near Junction Avenue in and through the City of Detroit . . . as part of the West Detroit Connector Project." None of the private parties disputed the necessity of the taking. Accordingly, on October 6, 2011, the trial court entered an order vesting title to the property in plaintiff's name as of July 22, 2011.

Following the taking, plaintiff moved Hovarth's cellular tower to the remainder of parcel two. The fence and security camera were stolen from parcel one sometime in 2012. Plaintiff thereafter reimbursed defendants for a new security camera and the construction of a new fence around the posttaking boundary line.

---

[2] Panacea, Elixir and Titan were the only defendants to move for exclusion of plaintiff's appraisal, participate in trial, and move for a directed verdict. Accordingly, the term "defendants" as used hereinafter refers exclusively to Panacea, Elixir and Titan.

B. MOTIONS IN LIMINE REGARDING EXPERT APPRAISALS

Plaintiff set aside $375,000 as just compensation for the 2.89 acres taken, but defendants believed their property was worth more. They retained Mark Sheppell to perform an appraisal. Based in part on TIP's prior tenancy, Sheppell identified the highest and best use for parcels one and two as "a use related to freight storage and transportation." Sheppell also believed the property could be used for truck driver training and instruction. U.S. Truck Driving Training School was set to lease 10 acres of defendants' remaining property to operate a truck driving school beginning on November 1, 2011, but the deal ultimately fell through. According to Sheppell, the amount of just compensation owed to defendants was $835,000.

In his deposition, Sheppell explained that although TIP was no longer a tenant and U.S. Truck Driving Training School had never leased the property, he expected demand for defendants' property to increase as the economy improved and other development projects in and around Detroit moved forward:

> *Q*. Okay. What was the condition of the market on that date?
>
> * * *
>
> *A*. I would say that, in general, the industrial market suffered just like most of the markets did. In 2008, for industrial buildings, it's my impression that the market was affected more for vacant land. . . . But that, like in any situation, where there's an economic downturn or when things are good, nothing lasts forever, and that there would be a reasonable anticipation that the market would rebound, based on things that are happening in downtown Detroit with the new bridge, the existing bridge, the international crossings that are there. I guess, the traffic patterns for the [Detroit International Bridge Crossing], and the anticipated traffic patterns for the new bridge.
>
> So it was a period in which the market had suffered a downturn, but it was, in my impression, stable at that point and improving.
>
> * * *
>
> *Q*. And you were anticipating that this demand would occur sometime in the future?
>
> *A*. Yes.
>
> *Q*. In the near future?
>
> *A*. Yes.

On August 9, 2013, plaintiff filed a motion in limine to exclude Sheppell's appraisal report and opinion concerning the value of the property. Plaintiff argued that Sheppell's evaluation was improperly based on TIP's prior tenancy and posttaking events, such as the possibility that a future buyer may use the property for trucking storage, a lease of the property

by Chassis Pros, LLC, which began between May and June 2013, and "a new international bridge between Detroit and Windsor and a possible future Detroit Intermodal Freight Terminal Project."

Plaintiff's expert, Michael Ellis, produced a competing appraisal report. Ellis estimated that the just compensation owed to defendants was $190,000. He believed that the highest and best use for the property was "a speculative land holding for potential open yard storage purposes." Ellis explained the term "speculative land holding" in his deposition:

> *A*. What that means is based on my investigation and research, which includes discussions with brokers . . . there's little to no demand for industrial land, including pieces similar to the subject. They're marketed for years. They remain on the market without receiving offers. So someone acquiring it, unless they're going to use—try to come up with something or they have a need for it, they'd be acquiring it speculatively, hoping that they could find something they could use it for. There's not a lot of demand.

On August 16, 2013, defendants filed a motion to exclude Ellis's appraisal and testimony at trial. Defendants argued that Ellis failed to comply with M Civ JI 90.09, because he determined the highest and best possible use to be "speculative" and stated that there was no market demand for the property. Further, defendants reasoned that if Ellis believed that there was no demand for the property as of the date of the taking, and the highest and best use was speculative land holding, Ellis's valuation was necessarily based on a future posttaking date, contrary to M Civ JI 90.13 and MCL 213.70.

After a hearing on both motions, the trial court denied plaintiff's motion to exclude Sheppell's appraisal, but granted defendants' motion to exclude Ellis's appraisal. The trial court found that Ellis's appraisal failed to identify a highest and best use for which there was market demand and that it valued the property at some "future speculative date," rather than at the time of the taking. It therefore ruled that Ellis's appraisal was contrary to "the legal requirements for determining highest and best use, market value and just compensation."

C. TRIAL ON JUST COMPENSATION

On October 21, 2013, the parties participated in a jury trial to determine an amount of just compensation. As the only expert available, plaintiff called Sheppell as an adverse witness to testify regarding his valuation of the property. Sheppell stated that defendants were due $835,000 in just compensation for the property that was taken. A listing of the five comparison properties used by Sheppell with their respective prices per square foot was admitted into evidence. Sheppell admitted that none of the comparison properties had been used for containerized truck storage and two of them were vacant on the date of the valuation. Defendants' property itself had not been used for containerized truck storage since 2010. Further, Sheppell agreed that, in his deposition, he relied upon the 2013 lease with Chassis Pros, LLC as evidence that containerized truck storage was the highest and best use for the property. The construction of a new bridge to Canada and the Detroit Intermodal Freight Terminal (DIFT) also led Sheppell to believe that demand for defendants' business would increase.

Plaintiff then called MDOT engineer Terry Stepanski. Stepanski was the manager of the DIFT project. The DIFT project was intended to expand the Livernois Avenue and Junction Avenue yard and increase "intermodal capacity, the movement from freight to containers to truck, the movement of these containers from trucks to rail and vice versa." As of July 22, 2011, the chances of the project going forward were "very slim," because MDOT had not yet secured a binding agreement between the interested railroads to fund the project. Stepanski acknowledged, however, that MDOT had published a May 14, 2010 press release stating "the railroads have agreed to pay a large share of the costs."

After Stepanski's testimony, plaintiff rested. Counsel for defendants then moved for a directed verdict in the amount of $835,000, arguing that Sheppell's valuation was the only estimate in evidence and must therefore be accepted. Defendants' counsel also cited *City of Detroit v Halicki*, unpublished opinion per curiam of the Court of Appeals, issued April 25, 1985 (Docket No. 67426), in which this Court stated that the trial court should have granted a directed verdict in favor of the defendant because the plaintiff city had failed to present a competing just compensation estimate at trial. Finding *Halicki* persuasive, the trial court granted defendant's motion and entered a judgment awarding defendants $835,000 in just compensation. This appeal followed.

II. ANALYSIS

A. EXCLUSION OF ELLIS'S APPRAISAL

Plaintiff argues that the trial court erred in excluding Ellis's appraisal. This Court reviews a trial court's decision to admit or exclude expert testimony for an abuse of discretion. *Lenawee Co v Wagley*, 301 Mich App 134, 161; 836 NW2d 193 (2013). However, as plaintiff argues, "preliminary issues of law underlying an evidentiary ruling are reviewed de novo." *Dep't of Transportation v Haggerty Corridor Partners Ltd Partnership*, 473 Mich 124, 134; 700 NW2d 380 (2005). De novo review is applicable because the trial court found that Ellis's appraisal "clearly violated the legal requirements for determining highest and best use, market value and just compensation." If the trial court admits or excludes evidence based on a misinterpretation of law, "it *necessarily* abuses its discretion." *Gay v Select Specialty Hosp*, 295 Mich App 284, 292; 813 NW2d 354 (2012).

The state and federal constitutions prohibit the taking of private property for public use without just compensation. US Const, Am V; Const 1963, art 10, § 2. "In the condemnation setting, 'just compensation' is defined as the amount of money that will put the person whose property has been taken in as good a position as the person would have been in had the taking not occurred." *Detroit/Wayne County Stadium Auth v Drinkwater, Taylor, & Merrill, Inc*, 267 Mich App 625, 632; 705 NW2d 549 (2005). There is no formula or specific measure of just compensation damages; instead, the determination depends upon consideration of all of the relevant facts in the case. *Detroit v Detroit Plaza Ltd Partnership*, 273 Mich App 260, 268; 730 NW2d 523 (2006). For this reason, the amount of just compensation should take into account all factors relevant to the fair market value of the property. *Silver Creek Drain Dist v Extrusions Div, Inc*, 468 Mich 367, 373-374, 378-379; 663 NW2d 436 (2003). Fair market value is priced as of the date of the taking. MCL 213.70(3). Any evidence that would tend to affect the property's valuation as of that date is relevant and evidence should be liberally received.

-5-

*Transportation Dep't v VanElslander*, 460 Mich 127, 130; 594 NW2d 841 (1999); *Stadium Authority*, 267 Mich App at 647. However, the value of the property at some future date is speculative and irrelevant. *Haggerty*, 473 Mich at 136-137.

Damages in a partial taking may include both the property taken and severance damages to the remaining property. *VanElslander*, 460 Mich at 130. The parties may present evidence of the cost to cure to prove severance damages. *Id*.

Fair market value is determined by considering the highest and best use for the property. *Stadium Authority*, 267 Mich App at 633. " 'Highest and best use' means 'the most profitable and advantageous use of the property even if the property is presently used for a different purpose or is vacant, so long as there is a market demand for such use.' " *Id*., quoting M Civ JI 90.09. A highest and best use should be legally permissible, financially feasible, maximally productive, and physically possible. *Detroit Plaza*, 273 Mich App at 285.

Defendants argue that the trial court properly excluded Ellis's appraisal based on its authority under MRE 702. The rule states:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. [MRE 702.]

Expert testimony may be excluded when based on assumptions that do not comport with the established facts. *Badalamenti v William Beaumont Hosp-Troy,* 237 Mich App 278, 286; 602 NW2d 854 (1999). If the expert's testimony does not comport with applicable legal standards, it is irrelevant and inadmissible because it will not assist the trier of fact in understanding the evidence or determining a fact in issue. See *Daubert v Merrell Dow Pharm, Inc*, 509 US 579, 597; 113 S Ct 2786; 125 L Ed 2d 469 (1993) (reflecting that the similarly worded FRE 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on reliable foundation and is relevant to the task at hand."). See also MRE 402 ("Evidence which is not relevant is not admissible.").

The trial court found that Ellis's appraisal "clearly violated" the requirements of just compensation and fair market value because Ellis's highest and best use of "speculative land holding" was not a "proper" highest and best use. Specifically, the trial court agreed with defendants that: (1) Ellis's use of the word "speculative" demonstrated that he valued the property on an unknown future date; and (2) Ellis stated there was "no demand" for the property, even though highest and best use requires the existence of some market demand. We disagree.

Ellis did not use the term "speculative" to convey that that his appraisal was set at a future date. Rather, Ellis contemplated that as of July 22, 2011, a prospective buyer would most likely purchase the property and hold it until finding a functional purpose for it later, including a possible use for open air storage. It was the latter, postholding use that Ellis described as speculative: "So someone acquiring it, unless they're going to use—try to come up with

something or they have a need for it, they'd be acquiring it speculatively, hoping that they could find something they could use it for." When asked whether his valuation was based on a future date, Ellis explained, "No, my estimate of value reflects what someone would be willing to pay as of that date[,]" meaning the date of the taking. Defendants did not argue, and the trial court did not find, that holding the property upon purchase cannot itself be a highest and best use. Highest and best use "requires only that the use on which the valuation is made be legally permissible, financially feasible, maximally productive, and physically possible." *Detroit Plaza*, 273 Mich App at 285. "The possibility of [the property's] use for all purposes, present and prospective, for which it is adapted and to which it might in reason be applied, must be considered . . . ." *Stadium Authority*, 267 Mich App at 643 (citation and quotation omitted). If the evidence demonstrates that market participants were purchasing land and holding it for potential later use, there is no reason that such "speculative land holding" cannot constitute a highest and best use. As revealed at trial, two of the properties Sheppell cited as comparables were held vacant upon purchase and were not put to a more productive use until a later time after the date of valuation. The trial court erred in excluding Ellis's appraisal on the basis that speculative land holding was not a "proper" highest and best use.

Ellis's admission that there was "no demand" for the property similarly does not render his opinion inadmissible. Highest and best use requires the existence of some underlying market demand. *Stadium Authority*, 267 Mich App at 633. Although Ellis stated that there was "no demand" for defendants' property, his appraisal attributed the lack of market demand to an absence of buyers looking to purchase land for active industrial development, not to an absence of buyers looking to purchase land as a speculative land holding:

> In recent years there has *been no demand to acquire land for new industrial development in the vicinity of the appraised property*. While it may be remotely possible that some industrial users might be able to justify new construction cost within the Clark Street Technology Park, it is speculative that this would have been the subject's location. As a result of the market conditions existing as of the respective date of valuation, the highest and best use of the subject 'as vacant' is as a speculative land holding for potential open yard storage purposes. [(Emphasis added).]

Ellis's appraisal also identified 11 market transactions and narrowed those down to five comparable sales, thereby showing at least some level of market demand for his identified highest and best use. Further, Ellis explained in his deposition that he identified "speculative land holding" as a highest and best use because of the lack of demand for other uses:

> The brokers that I talk to strongly emphasize that in my conversations, how little demand there is. You ask them, well, how long do you think it will take to sell, and they throw up their arms. You can hear it in their voice over the phone. Or if you were to talk to them, you know, they may throw up their arms physically. But you understand what I'm saying by throwing up their arms. They don't know. They put it on the market. They market it. They make their best effort. They've got signs on it. Signs are still active and they're looking old because they can't sell it. *There is no demand. And that's why my highest and*

*best use is identified what it is, is to reflect that type of market condition.* [(Emphasis added).]

The trial court erred in ruling that Ellis "conclud[ed] a highest and best value for which [Ellis] himself admits there is no demand." Although it is a fine distinction, Ellis did not state that there was "no demand" to use the property for speculative land holding; he opined that speculative land holding was the highest and best use for the property because there was "no demand" to use the property for some other identifiable purpose. The trial court erred in ruling that Ellis's highest and best use was improper and that it lacked market demand. It therefore abused its discretion in excluding Ellis's appraisal and testimony.

The trial court's exclusion of Ellis's appraisal warrants reversal. As explained, the trial court granted defendants' motion for a directed verdict because it found that Sheppell's appraisal was undisputed, and thus, plaintiff was prejudiced by the absence of Ellis's opinions. *Craig v Oakwood Hosp*, 471 Mich 67, 76; 684 NW2d 296 (2004) (describing the standard for reversal based on an evidentiary error). We remand for a new trial at which Ellis's appraisal and testimony may be admitted.

## B. ADMISSION OF SHEPPELL'S APPRAISAL

Plaintiff claims that the trial court erred in failing to exclude Sheppell's testimony. Specifically, plaintiff argues that Sheppell improperly based his valuation of the property on a use for which no market demand existed at the time of the taking. Plaintiff first criticizes Sheppell's reliance on TIP's prior use of the property as proof that truck and container storage was the property's highest and best use because TIP was not a tenant at the time of the taking. Highest and best use requires a market demand for that use and, since the property had no tenants for truck and container storage on July 22, 2011, plaintiff reasons that Sheppell's highest and best use necessarily lacked the requisite market demand. We disagree.

As explained, fair market value is determined as of the date of the taking, and one must determine a property's highest and best use to reach a fair market value. *Haggerty*, 473 Mich at 135, citing MCL 213.70(3); *Stadium Authority*, 267 Mich App at 633. But highest and best use is not fixed based on the use of the property as of the date of the taking. Highest and best use refers to the most profitable use that could be made of the property, even if, at the time of condemnation, "the property is presently used for a different purpose or is vacant." *Stadium Authority*, 267 Mich App at 633 (citation and quotation omitted). Plaintiff correctly asserts that highest and best use must be supported by market demand, but as the definition of highest and best use implies, the property's "present" use on the date of the taking does not exclude the possibility of market demand for other uses. For instance, the properties at issue in *Stadium Authority* were separately owned and used for different purposes by multiple defendants at the time of the respective takings. *Id.* at 629-630. Yet this Court affirmed that the jury could consider whether the highest and best use of the properties was assemblage for casino development, so long as it found that private assemblage for such development was "reasonably probable within a reasonable time and for a reasonable price[.]" *Id.* at 635-639. Thus, the fact that TIP was not a current tenant at the time of the taking does not render Sheppell's highest and best use opinion inadmissible. Further, plaintiff offers no authority to suggest that a property's use by a prior tenant is irrelevant to the question of market demand for highest and best use.

"Normally, existing use may be indicative of the use to which a potential buyer would put the property and is, therefore, relevant to the fair market value of the property." *Safran Printing Co v Detroit*, 88 Mich App 376, 382; 276 NW2d 602 (1979). The trial court did not abuse its discretion in declining to exclude Sheppell's appraisal on this basis.

Plaintiff next contends that Sheppell's appraisal should have been excluded because his highest and best use was based on posttaking events, such as the 2013 lease by Chassis Pro, LLC and a potential future increase in demand for truck and container storage. In support of its argument, plaintiff relies on *Haggerty*, 473 Mich at 136, wherein our Supreme Court determined that the trial court abused its discretion in admitting evidence that the property was rezoned after the taking:

> . . . [B]ecause just compensation must be calculated on the basis of the market value of a property on the date of the taking, the relevance of any such evidence is wholly dependent on whether, and how, the particular factor at issue would have affected the market participants *on that date*.
>
> * * *
>
> . . . In short, a posttaking zoning change is irrelevant to the just compensation calculation because it does not make the *fact of consequence*—that information regarding the reasonable possibility of a zoning change may have impacted the market value of property on the date of the taking—more probable or less probable. [*Id*. at 136, 140-141.]

Following *Haggerty*, this Court held in *Stadium Authority* that posttaking sales of comparable property could be used to impeach witnesses and confirm an expert's valuation as of the date of the taking. *Stadium Authority*, 267 Mich App at 646 n 13, 648-650. See also *Detroit Plaza*, 273 Mich App at 282-283 (finding no error in the trial court's admission of evidence of comparable sales after the date of valuation). Defendants argued before the trial court that the posttaking events cited by Sheppell were admissible under *Stadium Authority* and *Detroit Plaza*. When Ellis's appraisal and testimony are admitted on remand, the 2013 tenancy may be used for impeachment purposes or to confirm Sheppell's opinion regarding the highest and best use. *Stadium Authority*, 267 Mich App at 646 n 13, 648-650; see also *Detroit Plaza*, 273 Mich App at 282-283.

Plaintiff also complains that Sheppell's belief in a future increase in market demand was improper posttaking evidence. Plaintiff is incorrect. *Haggerty* precludes evidence of events that occurred after the date of the valuation because those events are irrelevant to the property's value as of that date. *Haggerty*, 473 Mich at 140-141. *Haggerty* does not, however, preclude that evidence showing the *probability* of the occurrence of a posttaking event, inasmuch as the probability of that event affects the value of the property at the time of the taking:

> We stress again that it is not the *probability* of a zoning change that is irrelevant to the just-compensation determination. Indeed, we adhere to the rule . . . that evidence of the reasonable possibility of a zoning change is admissible to the extent that it aids in determining the fair market value of the property at the time

of the taking. Rather, it is merely the *fact* of the posttaking zoning change that is irrelevant, as it is of no import in determining the price which a willing buyer would have offered for the property just prior to the taking. [*Id.* at 143 n 38 (citations and quotations omitted).]

Here, Sheppell's testimony speaks to the probability of posttaking events that may affect the property's value on the date of valuation. Sheppell cited the DIFT project and the public discussion of a new international bridge connecting Detroit and Windsor as the reasons he believed market demand for truck and containerized cargo storage would increase. Information concerning these projects was public and was knowable to a hypothetical market participant prior to the taking. Evidence concerning the probability of these events can therefore be considered "to the extent that [they] aid[] the fact-finder in determining the price which a willing buyer would have offered for the property *just prior to the taking*." *Haggerty*, 473 Mich at 138 (quotations and citation omitted). The trial court did not abuse its discretion in declining to exclude Sheppell's testimony on this basis.

### C. DIRECTED VERDICT

Plaintiff also contends that the trial court erred in granting defendants' motion for a directed verdict. A trial court's decision on a motion for a directed verdict is reviewed de novo. *Krohn v Home-Owners Ins Co*, 490 Mich 145, 155; 802 NW2d 281 (2011). This Court reviews the evidence and all legitimate inferences in the light most favorable to the nonmovant. *Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124, 131; 666 NW2d 186 (2003). "A directed verdict is appropriate only when no material factual questions exist on which reasonable minds could differ." *Merkur Steel Supply Inc, v City of Detroit*, 261 Mich App 116, 123; 680 NW2d 485 (2004). Given our conclusion that the trial court erred by excluding Ellis's testimony and report, we need not consider this issue, as Ellis's testimony and report would have presented facts upon which reasonable minds could differ. Moreover, as discussed below, we find that the trial court's decision to grant a directed verdict in this case was in error.

In granting defendants' motion, the trial court relied heavily on *Halicki*, unpub op at 3-4. In *Halicki*, the original appraiser that the plaintiff (the city of Detroit) intended to present as a witness failed to appear for trial. *Id.* at 1-2. The city instead presented William Thompson, Chief Coordinator of Acquisitions for Community and Economic Development in Detroit, to testify concerning the value of the property. *Id.* at 2. This Court held that the trial court's admission of Thompson's testimony was improper because he had no personal knowledge of the property at issue. *Id.* at 2-3. The Court then concluded that "[s]ince the [c]ity did not present any competent evidence of value, and the only other evidence" of the property's value was the testimony of the defendant's expert, "the trial court should have directed the verdict" in favor of the defendant in the amount identified by his expert. *Id.* at 4.

As an unpublished opinion, *Halicki* is not binding. See MCR 7.215(C)(1). Moreover, it is not analogous. In *Halicki*, unpub op at 4, the testimony of the defendant's expert was the "only other evidence on value" of the property. In this case, Sheppell's testimony was not the "only evidence on value." Sheppell's list of five comparable properties was also in evidence, and four of those properties had prices per square foot below the number relied upon by Sheppell in calculating his $835,000 estimate. In its opening statement, plaintiff suggested that the jury rely on the evidence of "actual listings" and "dollar [per] square[]foot" prices in reaching its

conclusion. Although the jury could have accepted Sheppell's estimate without considering the comparable prices per square foot, the nonmovant on a motion for a directed verdict has the right to ask the jury to believe the case as he presented it, even if that case appears improbable. *Caldwell v Fox*, 394 Mich 401, 407; 231 NW2d 46 (1975) (citation omitted). Plaintiff also elicited admissions from Sheppell at trial that brought his estimate into question. Sheppell acknowledged that none of the comparable properties had been used for container or truck storage, and that two of the comparables, as well as the subject property itself, were vacant at the time of the taking. Sheppell at first stated that the cost of the fence and security camera were included in his estimate, while acknowledging that plaintiff had already paid for these repairs, but later claimed these costs were not included when questioned by defendants' counsel. He also admitted that the $835,000 figure included the cost of improvements that were not included in the taking, such as the modular office. In addition, Stepanski testified that funding for the DIFT project was not in place at the time of the taking, implying that Sheppell's assumption that defendants' business would increase was incorrect. Ultimately, it is for the jury to weigh the evidence and determine the credibility of witnesses, including experts. *King v Reed*, 278 Mich App 504, 523 n 5; 751 NW2d 525 (2008). Given that there was conflicting evidence, the trial court should have submitted this matter to the jury. The trial court erred in granting defendants a directed verdict.

Vacated and remanded for a new trial consistent with this opinion. We do not retain jurisdiction.

/s/ Jane M. Beckering
/s/ Mark J. Cavanagh

-11-