# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

RICHARD DONALD MARCOTTE, III,

Defendant-Appellant.

UNPUBLISHED
August 29, 2017

No. 332852
Kalamazoo Circuit Court
LC No. 2015-000818-FH

Before: BOONSTRA, P.J., and RONAYNE KRAUSE and SWARTZLE, JJ.

PER CURIAM.

Defendant appeals by right from his conviction following a jury trial of assault with intent to do great bodily harm less than murder, MCL 750.84. Defendant was sentenced as a fourth-habitual offender, MCL 769.12, to 25 to 50 years' imprisonment. We affirm.

On June 5, 2015, the victim, Bradley Holmes, his family, and his girlfriend, Mary Shief, attended a Greek festival and a concert in Kalamazoo, where they met and shared a few beers while listening to the music with their friends, Stephanie Gernaat and her boyfriend Andrew Brinkert. While Holmes, Shief, Gernaat, and Brinkert were heading back to the carport near an alleyway where their car was parked, Shief testified that Holmes stopped to admire a motorcycle owned by Geoffery Varner.[1] A fight soon erupted between Varner and Holmes. Defendant joined as the altercation grew more serious, stabbing Holmes multiple times.

Initially, a friendly conversation had sparked between Varner and Holmes as Varner sat on the bike. Holmes testified that "while [he] was just trying to compliment [Varner] about his bike" "[Varner had] started saying provocative things about [Shief]," who had been standing right next to Holmes' side listening. Shief testified that she did not hear exactly what was said, but that Holmes turned around and told Varner "to be respectful." At first, Holmes stated, he had intended to ignore it. It was only after Varner made a sexually charged racial comment which "used the 'N' word" about Shief, who was African American, that Holmes "got in [Varner's] face." Subsequently, Holmes and Varner began to fight. As Holmes was on the ground

---

[1] Shief testified that Varner was with defendant and defendant's [now] wife, Althea Simmons, who were both sitting on a motorcycle next to Varner's.

wrestling with Varner, defendant[2] came up and kicked Holmes' side. Holmes also believed he was stabbed by defendant in the back while he and defendant were wrestling. Immediately after, Holmes said he thought he had been stabbed and asked Gernaat to call 911, which she did.

Kalamazoo Public Safety Officer Brian Boyer was the first officer on the scene after he had received a call from station one in the city of Kalamazoo and a man flagged him down to tell him of the stabbing. This man gave him directions on how to get there. Simultaneously, dispatchers were giving out the same information to others. When Boyer first arrived and parked his police car,[3] people were yelling that there were two suspects farther down to the west. Boyer first tried to get everything settled down and helped to keep people away from the victim. As soon as the other officers came on the scene, he started to delegate tasks (i.e. for people to render aid, to begin interviewing witnesses, etc.) Kalamazoo Public Safety Officer Kristie Hofer also received a call to respond to 251 East Michigan regarding a stabbing, labeling the nature of the call received as being "vague and chaotic." Hofer testified that she searched for the weapon used to stab Holmes at the scene, but did not find one. Kalamazoo Public Safety Officer Jacob Vyverman testified that Varner agreed to be searched and informed him of having a small pocket knife in his coat pocket. Vyverman described the knife as a small, folding pocket knife. Vyverman testified that the pocket knife blade "was under three inches, and it was smaller than your average pocket knife that any man or woman would carry." Vyverman stated that he opened Varner's pocket knife and conducted a thorough search, describing how the knife had been dry with no blood or foreign objects on it and how he had examined the hilt of the knife to ensure that it was dry. Vyverman testified that he then gave it back to Varner, who was ruled out as a suspect there and then.

When asked at trial if there was a specific length that a knife would have to be to cause Holmes' injuries, trauma and brain surgeon Dr. James Kraatz,[4] who treated Holmes, testified as follows:

> The only thing that I could say with regard to that was that it would have to be long enough to penetrate through the muscle and through the skin, the subcutaneous fat, the fat that's under the skin, the underlying muscle, the muscle between the ribs and chest. And in general, in a person that has fairly normal amounts of body fat, that's gonna [sic] be probably two-and-a-half, three inches. It would have to be at least that long and you'd really be up to the hub if it was

---

[2] Holmes testified that he did not think defendant and Simmons were in any way connected to Varner or the dispute until after the confrontation began. Shief further testified that defendant came from nowhere and joined the fight after the fighting had become "intense."

[3] Sergeant Boyer's vehicle was equipped with a camera called a DVR unit which is to record any conversation that a law enforcement officer or Sergeant conducts with a pedestrian.

[4] Dr. Kraatz was qualified as an expert at trial in the diagnosis and treatment of traumatic injuries and had testified in court more than ten times over the course of his approximately fifteen years in practice to serve in that capacity.

that. I would anticipate that it would be something that'd probably be a little bit longer than that.

During closing arguments, the prosecutor made the following statement to the jury:

So we have the officer saying the knife in [Varner's] pocket was less than three inches and the doctor saying the knife had to be at least three inches in order to cause the injuries.

I submit to you that the knife in [Varner's] pocket that was examined by the police is not large enough to have caused the injuries in this case.

Defense counsel immediately objected to these statements, arguing that the prosecutor was misstating Kraatz's testimony. Defense counsel stated, "[I]t says two-and-a-half to three. If we're gonna . . . be fair, let's keep it fair here." The trial court instructed the jury, "For the commentary, I simply advise the jury that you have your notes with regard to the evidence. What attorneys say may or may not comport with that. Trust your notes."

Defendant argues that the prosecutor's alleged mischaracterization during closing arguments of Kraatz's testimony about the necessary size of the knife blade constituted prosecutorial misconduct and denied him of a fair and impartial trial. "In order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010) citing *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008). At trial, defense counsel objected to the prosecutor's cited statement during closing arguments, and the court gave a curative instruction. Therefore, we review this preserved claim of prosecutorial misconduct de novo. *People v Pfaffle*, 246 Mich App 282, 288; 632 NW2d 162 (2001).

Where a claim of prosecutorial misconduct is based on the assertion that the prosecutor made an improper argument, the reviewing court must read the remarks in context, evaluating them "in light of defense arguments and the relationship they bear to the evidence admitted at trial to determine whether a defendant was denied a fair and impartial trial." *People v Schutte*, 240 Mich App 713, 721; 613 NW2d 370 (2000) abrogated in part on other grounds by *Crawford v Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004). "Although a prosecutor may not argue facts not in evidence or mischaracterize the evidence presented, the prosecutor may argue reasonable inferences from the evidence." *People v Watson*, 245 Mich App 572, 588; 629 NW2d 411 (2001).

Defendant's theory of the case was that it was in fact Varner, not defendant, who stabbed Holmes. Defense counsel spent much of his closing argument casting doubt on the veracity of the witnesses to the crime. He argued that "the prosecutor is so afraid of that knife, he's arguing over a half-inch. He is trying to make you forget that the other assailant had a knife in his pocket . . ."

Again, the prosecutor argued that Kraatz testified that the knife that inflicted Holmes' wounds "had to be at least three inches long," and thus Varner's knife could not have caused the injury because Vyverman testified that Varner's knife was less than three inches. Kraatz opined that, based on the injuries sustained by Holmes, the knife blade that stabbed him had to be " . . .

probably two-and-a-half, three inches. It would have to be at least that long and you'd really be up to the hub if it was that. I would anticipate that it would be something that'd probably be a little bit longer than that." The prosecutor's characterization of Kraatz's testimony was consistent with that testimony. In essence, Kraatz qualified his own testimony that the length would have to be "two-and-a-half, three inches" by indicating that length would probably be sufficient if the thrusts were "up to the hub" (reasonably understood to mean the bolster), but that in reality, he thought it would have to be longer than that cited range, i.e., longer than three inches. On rebuttal, the prosecutor acknowledged that he and defense counsel did not agree about the doctor's testimony.

In any event, the court timely instructed the jury to refer to their notes and to trust their notes when determining the facts of the case, and later cautioned that "[w]hat attorneys say may or may not comport with that." Consistent with this, the court instructed the jury in its closing instructions that "the lawyers' statements and arguments are not evidence" and "[y]ou should only accept things the lawyers say that are supported by the evidence or by your own common sense and general knowledge." There is nothing in the record to undermine the well-established legal maxim that "jurors are presumed to follow their instructions." *Unger*, 278 Mich App at 235.

Next, in defendant's standard 4 brief, defendant argues that he was deprived of a fair trial based on ineffective assistance of counsel and therefore, that he should be granted a Ginther Hearing and that his case should be remanded for a new trial. He states that his defense attorney was ineffective at trial in advising him not to testify on his own behalf, not having requested that Boyer's dash cam video be shown in its entirety[5], and for not having called Althea Simmons to testify.

Boyer testified that his squad car camera captured a video of the scene after police arrived and that video was played for the jury. Boyer testified that the video showed Simmons picking a "shiny" item up in the landscaped area where a helmet and other things had been dropped. Boyer further testified that the video showed Simmons walk away toward another alley after she had picked up the item. There was nothing found in the alley where she had walked down when the alleyway was searched. Defendant argues that were this video that Boyer describes to be seen in its entirety, the jury would see that the item picked up was a helmet and that, had the jury been able to see the full clip, they would have seen two officers were present at that time.

An ineffective assistance of counsel claim is preserved when a defendant moves for a new trial or a Ginther Hearing on that basis in the trial court. *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009). Defendant failed to move in the trial court for a new trial or an evidentiary hearing. Thus, this issue is unpreserved. "When a defendant did not move in the trial court for a new trial or an evidentiary hearing, this Court's review is limited to mistakes apparent from the record." *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). "A

---

[5] Sergeant Boyer's dash cam recorded the alley where defendant and now-wife, Althea (nee Simmons), were located as well as Officer Charles Treppa Jr.'s interview with them.

claim of ineffective assistance of counsel is a mixed question of law and fact." *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882, lv den 482 Mich 1186 (2008), recon den 483 Mich 917 (2009), citing *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). We review questions of fact for clear error. *People v McSwain*, 259 Mich App 654, 681; 676 NW2d 236 (2003) citing *People v Crear*, 242 Mich App 158, 167; 618 NW2d 91 (2000) overruled on other grounds by *People v Miller*, 482 Mich 540; 759 NW2d 850 (2008). "[W]e review de novo questions of constitutional law." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008).

"[T]o find that a defendant's right to effective assistance of counsel was so undermined that it justifies reversal of an otherwise valid conviction, a defendant must show that counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced the defendant as to deprive him of a fair trial." *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994). Representing a criminal defendant requires a defense attorney to perform certain basic duties such as to assist defendant, advocate on his behalf, keep him informed on important developments throughout the progression of the prosecution, and to "bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland v Washington*, 466 US 668, 688, 104 S. Ct. 2052, 80 L Ed 2d 674 (1984), superseded by statute28 USC §2254(d) (1994 ed, Supp III), citing *Powell v Alabama*, 287 US at 68-69, 53 S Ct, at 63-64 (1994). However, "defense counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." See *Unger*, 278 Mich App at 242 citing *People v Pickens*, 446 Mich 298, 325; 521 NW2d 342 (2004). "We will not substitute our judgment for that of counsel on matters of trial strategy, nor will we use the benefit of hindsight when assessing counsel's competence." *Unger*, 278 Mich App at 242–243. "The defendant must also show that this performance so prejudiced him that he was deprived of a fair trial." *People v Grant*, 470 Mich 477, 486; 684 NW2d 686 (2005), citing *Pickens*, *supra* at 338; 521 NW2d 797.

As the video played in the trial court below is not made available to this Court, we limit our review to what is described about the video during the witness's testimony, which is part of the record. At trial, Sergeant Boyer described the recording which was played for the jury, stating that the video showed how someone had dropped property in a grassy area near the scene of the stabbing and stated that subsequently " . . . [a] white female then proceed[ed] to pick up an object from the grassy greenish landscaped area . . . " and how the object she picked up was clearly "shiny" when she turned. The white female was subsequently identified by Boyer as Althea Simmons, defendant's wife. Then, he described how Simmons had walked into an alley in between two buildings for a short period of time, only to walk back into sight a short while later. Defense counsel objected to the relevance of the video and highlighted that the dropped object was in no way able to be linked to defendant, as he was absent throughout the clip. Furthermore, on cross-examination, defense counsel impeached the officer on his client's absence from that clip. The decision not to play the tape was obviously a strategic choice by defense counsel, which we will not second guess. *Unger*, at 242-243.

Defendant's assertion that, had the full clip been played for the jury, they would have been able to see that there were two officers behind the vehicle with Simmons, making it impossible for her to have dropped the knife, is merely a speculative argument and such speculation is not nearly enough to presume counsel to have been ineffective. Boyer himself

-5-

testified that he could not determine what the "object" was and that they did not find it. Further, this would be merely cumulative as the officers had already given testimony that they had been in that area at the time Althea picked the object up and walked into the alley, as in fact, Sergeant Boyer whose testimony has been stated above, was one such officer. Thus, the effect would be insufficient to undermine confidence in the outcome, *Turner v US*, 137 S Ct 1885, 1887, 85 USLW 4488, 17 Cal Daily Op Serv 5916 (2017), as one of the four elements which must be met to allow for defendant's motion to be granted for a new trial is that the evidence which was not originally submitted must not be merely cumulative. *People v Terrell*, 289 Mich App 553, 559; 797 NW2d 684 (2010).

Next, advising a client to exercise his right to remain silent is also a matter of trial strategy which defendant has an option of declining and so we shall defer to the trial attorney's judgement. "Although counsel must advise a defendant of this right, the ultimate decision whether to testify at trial remains with the defendant." *People v Bonilla-Machado*, 489 Mich 412, 419; 803 NW2d 217 (2011).

Finally, defendant's assertion that defendant's wife Simmons should have testified is baseless as there is no offer of proof as to what she would testify that would bring about reversal. Errors in the exclusion of testimony should not upset a judgment, unless a substantial injustice has resulted. The substance of the evidence must be made known to the court through an offer of proof. *People v Parks*, 478 Mich 910, 913; 733 NW2d 14 (2007). "[A]n offer of proof serves the dual purpose of informing the trial court of the nature and purpose of the evidence sought to be introduced, and of providing a basis for the appellate court to decide whether to sustain the trial court's ruling." *Detroit v Detroit Plaza Ltd Partnership*, 273 Mich App 260, 291; 730 NW2d 523 (2006), see MRE 103(a)(2). Exclusions of evidence may not support a finding of error unless a substantial right of defendant has been violated. Thus, our review is limited to defendant's substantial rights. *Landin v Healthsource Saginaw Inc*, 305 Mich App 519, 541; 730 NW2d 523 (2006). Without an offer of proof this Court will assume that counsel's failure to call the witness was an objectively reasonable one. Defendant has not overcome that presumption in this case and has failed to show that were such evidence admitted, there would be a reasonable probability that the trial would have resulted differently. *Parks*, at 913-914.

Further, the claim that the object which was picked up by Simmons in the video clip deemed to be indiscernible to the viewers was a helmet is also speculative and this would not have been likely to change the outcome of trial. The jury heard from multiple eye-witnesses that defendant's blows to Holmes' back were in the same locations as his stab wounds. Furthermore, no matter what Simmons may have testified to that potential testimony would not have undermined Holmes' testimony. He was sure that it was defendant, not Varner, who was the one who had stabbed him, which had been followed by his description of feeling as if he had been repeatedly slapped on the back by defendant and how blood had "sprayed out" from his back as Gernaat had lifted his shirt following the fight.

As defendant's argument does not amount to clear error in the record this Court concludes that trial counsel was not ineffective.

Affirmed.

/s/ Mark T. Boonstra
/s/ Amy Ronayne Krause
/s/ Brock A. Swartzle