*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JASON MAXEY and BETHANY MAXEY,

        Plaintiffs-Appellants/Cross-Appellees,

v

BOTSFORD GENERAL HOSPITAL, GLENDALE NEUROLOGICAL ASSOCIATES, P.C., and ROBERT PIERCE, D.O.,

        Defendants-Appellees/Cross-Appellants,

and

PROGRESSIVE HEALTH CARE, MICHAEL HAROUTUNIAN, D.O., and WILLIAM RUDY, D.O.,

        Defendants-Appellees,

and

DAVID GREEN and WILLIAM BOUDOURIS,

        Defendants.

UNPUBLISHED
February 17, 2022

No. 353920
Oakland Circuit Court
LC No. 2015-148616-NI

JASON MAXEY and BETHANY MAXEY,

        Plaintiffs-Appellants,

v

BOTSFORD GENERAL HOSPITAL, GLENDALE NEUROLOGICAL ASSOCIATES, P.C., and ROBERT PIERCE, D.O.,

No. 356404
Oakland Circuit Court
LC No. 2015-148616-NH

-1-

Defendants-Appellees,

and

PROGRESSIVE HEALTH CARE, MICHAEL
HAROUTUNIAN, D.O., WILLIAM RUDY, D.O.,
DAVID GREEN, and WILLIAM BOUDOURIS,

Defendants.

Before: K. F. KELLY, P.J., and SAWYER and GADOLA, JJ.

PER CURIAM.

In these consolidated appeals,[1] in Docket No. 353920, plaintiffs Jason Maxey and Bethany Maxey[2] appeal as of right the trial court's final order of dismissal. In Docket No. 356404, plaintiffs appeal as of right the trial court's postjudgment order imposing costs against them under MCR 2.625 in favor of defendants Glendale Neurological Associates, P.C. ("Glendale"), Dr. Robert Pierce, and Botsford General Hospital ("Botsford"). Finding no error warranting reversal, we affirm.

Plaintiffs brought this medical malpractice action against defendants Botsford, Progressive Health Care ("Progressive"), Glendale, and Dr. Michael Haroutunian, Dr. William Rudy, Dr. David Green, Dr. William Boudouris, and Dr. Pierce. In prior appeals, this Court held that the trial court erred by failing to conduct *Daubert*[3] hearings to determine the reliability of plaintiffs' experts' proposed testimony and remanded for such hearings. See *Maxey v Botsford Gen Hosp*, unpublished order of the Court of Appeals, entered April 5, 2018 (Docket No. 340812) ("*Maxey I*"), and *Maxey v Botsford Gen Hosp*, unpublished per curiam opinion of the Court of Appeals, entered August 22, 2019 (Docket Nos. 341988, 341992) ("*Maxey II*"). Following hearings on the latest remand, the trial court entered orders granting motions in limine and summary disposition in favor of Botsford and Glendale and Dr. Pierce (collectively the "Glendale defendants") and assessed costs. These appeals concern those orders.

---

[1] The appeals were consolidated by this Court to "advance the efficient administration of the appellate process." *Maxey v Botsford Gen Hosp*, unpublished order of the Court of Appeals, entered March 2, 2021 (Docket Nos. 353920, 356404).

[2] Bethany Maxey's claim for loss of consortium is derivative of Jason Maxey's medical malpractice claims. Therefore, this opinion uses the singular term "plaintiff" to refer to Jason Maxey only.

[3] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

-2-

## I. BASIC FACTS AND PROCEDURAL HISTORY

On February 17, 2013, plaintiff presented to Botsford with complaints of left-sided weakness and facial droop. He could not hold up his left arm or walk. He also reported severe headache, blurred vision, nausea, and vomiting. Plaintiff was admitted to Botsford under the service of David Green, D.O., William Rudy, D.O., William Boudouris, D.O., Michael Haroutunian, D.O., and Robert Pierce, D.O.

On February 18, 2013, an MRI was performed on plaintiff's brain, which "showed evidence of restricted diffusion involving a large portion of the right cerebral hemisphere within the MCA [main carotid artery] distribution." The MRI revealed "a suspected occlusion of the right internal carotid artery, and right middle cerebral artery." Samuel Jassenoff, D.O., performed and interpreted a Doppler ultrasound of the carotid artery and "found the possibility of significant stenotic disease near the origin of the right common carotid artery." Plaintiff subsequently suffered an ischemic stroke caused by occlusion of a blood vessel in his brain.

In their complaint, filed on August 17, 2015, plaintiffs alleged that the defendant physicians failed to recognize that a stroke was imminent, and the failure to timely prevent, diagnose, and treat the stroke caused multiple disabilities, including difficulty in ambulating, impaired speech, impaired vision, debilitating left-side weaknesses, impaired cognition, and loss of use of his left arm, hand, and leg. Plaintiff also claimed to have experienced emotional distress, loss of income, and loss of employment as a result of the stroke. Plaintiffs alleged that with proper treatment, plaintiff would have had an improved outcome as measured by his modified Rankin scale (mRS) six months after the stroke.[4] Plaintiff was evaluated as having an mRS score of three or four, because he could walk short distances without assistance, but needed a wheelchair for longer distances.

Plaintiffs' proposed expert witnesses were Dr. Nancy Futrell, Dr. Chitra Venkatasubramanian, M.D., and Dr. Gregg Zoarski, M.D. This appeal concerns four of plaintiffs' theories that defendants breached the applicable standard of care for a patient with carotid artery dissection at risk of a stroke: (1) defendants failed to timely administer tPA (tissue plasminogen activator); (2) defendants failed to change plaintiff's drug treatment from aspirin (an antiplatelet drug) to Heparin (an anticoagulant drug) after he suffered a transient ischemic attack (TIA) while on aspirin; (3) defendants failed to consult an interventional neuroradiologist regarding

---

[4] The mRS is a six-point scale measuring the patient's level of disability. A score of zero is assigned to a patient with no symptoms. A score of one is given to a patient who has some symptoms, but is able to perform usual activities. A score of two is assigned for a patient who has a "slight disability" and is able to manage finances and personal affairs, but needs some help. A score of three is assigned for a patient with moderate disabilities. The patient is able to walk without assistance, but needs help for other activities. A score of four is given to a patient with moderately severe disabilities, including an inability to walk without assistance. A score of five is assigned to a patient who is bedbound, possibly unable to talk, and possibly unresponsive. Lastly, a score of six means that the patient is deceased.

endovascular therapy to physically dissolve the clot; and (4) defendants failed to exercise proper control over plaintiff's blood pressure and heart rate.

Defendants filed multiple motions to exclude expert testimony supporting plaintiffs' claims that there was a greater than 50 percent probability that plaintiff would have achieved a more favorable outcome if defendants had not violated these standards of care. Defendants also asserted that the experts' opinions failed to meet the reliability requirements of MRE 702 and MCL 600.2955. Defendants moved for summary disposition of these claims under MCR 2.116(C)(10).

In 2017, the trial court granted summary disposition in defendants' favor regarding the Heparin and blood pressure claims without conducting a *Daubert* hearing. The trial court also dismissed the tPA claim after striking the testimony of plaintiffs' expert witnesses without conducting a *Daubert* hearing. In *Maxey I*, in lieu of granting plaintiffs' application for leave to appeal, this Court vacated the trial court's orders and remanded for a *Daubert* hearing. Following the hearing, the trial court again excluded the testimony and granted summary disposition in defendants' favor. In *Maxey II*, this Court held that the trial court did not err by denying defendants' motions for entry of judgment, but erred by failing to hold a *Daubert* hearing "as to the reliability of Dr. Zoarski's opinion regarding endovascular intervention[,]" and accordingly, remanded for such a hearing. *Maxey II*, unpub op at 6, 9. Following proceedings on remand, the trial court concluded that the medical literature did not support Dr. Zoarski's opinion. The trial court subsequently issued a final order of dismissal because the orders granting the motions in limine and motions for summary disposition left plaintiffs without any remaining viable claims.

Defendants also moved to strike Dr. Futrell and Dr. Venkatasubramanian as expert witnesses on the ground that they were not qualified experts under MCL 600.2169. The trial court denied this motion. Defendants challenge this ruling on cross-appeal.

Botsford and the Glendale defendants thereafter filed motions for costs under MCR 2.625. Botsford sought a total of $146,451.97 in expert witness fees for 10 witnesses. The Glendale defendants requested costs in the amount of $41,385. Plaintiffs did not respond to the Glendale defendants' motion. The trial court ultimately awarded Botsford taxable costs in the amount $120,864.47, and awarded the Glendale defendants their requested costs of $41,385.

## II. DOCKET NO. 353920

### A. FAILURE TO TREAT WITH HEPARIN AND TO CONTROL BLOOD PRESSURE AND HEART RATE

Plaintiffs first argue that the trial court erred by excluding expert testimony that plaintiff's stroke could have been prevented if he had been treated with Heparin after aspirin failed to prevent a TIA or if plaintiff's blood pressure had increased. They argue that the trial court should not have decided that this proposed testimony was inadmissible without first conducting a *Daubert* hearing. We disagree.

A trial court's decision whether to admit expert testimony, including its exercise of its role as gatekeeper, is reviewed for an abuse of discretion. *Gay v Select Specialty Hosp*, 295 Mich App 284, 290; 813 NW2d 354 (2012). "An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes." *Jilek v Stockson*, 297 Mich App 663,

665; 825 NW2d 358 (2012). Although trial courts have considerable discretion in determining whether a witness is qualified as an expert, courts must accurately apply the law in exercising their discretion. *Gay*, 295 Mich App at 291.

"In a medical malpractice case, plaintiff bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. Failure to prove any one of these elements is fatal." *Wischmeyer v Schanz*, 449 Mich 469, 484; 536 NW2d 760 (1995) (citations omitted); see also *Kalaj v Khan*, 295 Mich App 420, 429; 820 NW2d 223 (2012). "In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%." MCL 600.2912a(2). "Thus, to recover for the loss of an opportunity to survive or an opportunity to achieve a better result, a plaintiff must show that had the defendant not been negligent, there was a greater than fifty percent chance of survival or of a better result." *Dykes v William Beaumont Hosp*, 246 Mich App 471, 477; 633 NW2d 440 (2001).

In medical malpractice cases, expert testimony is required to (1) establish the applicable standard of care, and (2) demonstrate a breach of that standard. *Gonzalez v St John Hosp & Med Ctr (On Reconsideration)*, 275 Mich App 290, 294-295; 739 NW2d 392 (2007). Expert testimony may not be based on mere speculation, and there "must be facts in evidence to support the opinion testimony of an expert." *Teal v Prasad*, 283 Mich App 384, 395; 772 NW2d 57 (2009). The admission of expert testimony is governed by MRE 702[5] and MCL 600.2955.[6]

---

[5] MRE 702 states:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

[6] MCL 600.2955 states:

(1) In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

(a) Whether the opinion and its basis have been subjected to scientific testing and replication.

(b) Whether the opinion and its basis have been subjected to peer review publication.

The trial court "may admit evidence only once it ensures, pursuant to MRE 702, that expert testimony meets that rule's standard of reliability." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004). "This gatekeeper role applies to *all stages* of expert analysis. MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data." *Id*.

Plaintiffs assert the trial court erred by deciding, without conducting a *Daubert* hearing, that their experts' opinions were not scientifically supported. They rely on this Court's statement in *Lenawee Co v Wagley*, 301 Mich App 134, 163; 836 NW2d 193 (2013), that "*Daubert* hearings are required when dealing with expert *scientific* opinions in an effort to ensure the reliability of the foundation for the opinion . . . ." In *Wagley*, the plaintiff argued on appeal that the trial court erred by allowing a realtor to give expert testimony regarding the effect of the defendant's airport development plans on the marketability and value of the plaintiff's property. *Id*. at 161.

Contrary to plaintiffs' arguments, this Court did not broadly declare in *Wagley* that a *Daubert* hearing is mandatory when a trial court exercises its gatekeeping function to determine the reliability of scientific expert testimony. In *Wagley*, we stated that the *Daubert* principles apply to all expert testimony, but trial courts have flexibility in determining which principles reasonably apply to the specific expert testimony at issue. *Id*. at 161. We further explained that *Daubert* hearings "are required when dealing with expert scientific opinions in an effort to ensure the reliability of the foundation for the opinion . . . ." *Id*. at 163.

The trial court did not need to hold a *Daubert* hearing to ensure the reliability of the foundation for plaintiffs' experts' opinions on the superior efficacy of Heparin and on the efficacy of blood pressure control and heart rate control. In the context of a medical malpractice action,

---

(c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

(2) A novel methodology or form of scientific evidence may be admitted into evidence only if its proponent establishes that it has achieved general scientific acceptance among impartial and disinterested experts in the field.

(3) In an action alleging medical malpractice, the provisions of this section are in addition to, and do not otherwise affect, the criteria for expert testimony provided in section 2169.

plaintiffs were required to prove both that failure to provide this treatment constituted a breach of the applicable standard of care and that failure to provide this treatment cost plaintiff the opportunity to achieve a more favorable outcome by more than 50 percent. A *Daubert* hearing was unnecessary because defendants produced an ample body of scientific literature establishing that there was no clinically significant difference between the outcomes of carotid dissection patients who receive antiplatelet drugs and anticoagulant drugs, and plaintiffs failed to produce literature with competing evidence. Plaintiffs' expert, Dr. Futrell, testified that the Cervical Artery Dissection in Stroke Study (CADISS) researchers used a fallacious statistical analysis, and that she was working with a statistician to demonstrate the fallacy. This testimony was speculative in nature, because completed research had not yet been produced. Therefore, a *Daubert* hearing would have been futile because plaintiffs did not demonstrate that there was anything to present in support of admission of their experts' opinions.

With respect to blood pressure control and heart rate control, defendants did not produce studies disproving Dr. Zoarski's claim, but relied instead on plaintiffs' inability to produce studies supporting the claim. Plaintiffs responded by merely attaching photocopies of scientific publications that purportedly supported Dr. Zoarski's opinion. But plaintiffs failed to analyze any of the literature, and failed to offer complete information on the sources. Conversely, Botsford analyzed plaintiffs' exhibits for the trial court, illustrating that none of it supported Dr. Zoarski's opinion. Plaintiffs never responded with a contradictory analysis. Because plaintiffs failed to demonstrate a basis for supporting the admission of Dr. Zoarski's testimony, the trial court did not abuse its discretion by granting defendants' motions in limine without conducting a *Daubert* hearing with respect to this issue.

## B. tPA

Next, plaintiffs argue the trial court erred by finding that Dr. Futrell's and Dr. Venkatasubramanian's opinions regarding the preferability of tPA to prevent stroke in a carotid artery dissection patient were not supported by scientific research. We disagree.

Plaintiffs assert the trial court erred by not allowing them to admit scientific literature that was not part of the record before this Court's remand in *Maxey I*. This Court's order in *Maxey I* remanded for a *Daubert* hearing in which Dr. Futrell and Dr. Venkatasubramanian "shall be given the opportunity to explain the basis for their opinions regarding the administration of tPA in light of the literature that appears to contradict them." This statement does not expressly limit the experts' reliance on "the literature" to the materials previously offered. In any event, MCR 2.119(C)(1) provides that a trial court has discretion to set the period for filing briefs and affidavits in support of a motion. MCR 2.401(B)(2)(a) allows the court to "establish times for events and adopt other provision the court deems appropriate," including "the amendment of pleadings, adding of parties, or filing of motions." *Kemerko Clawson, LLC v RXIV Inc*, 269 Mich App 347, 349; 711 NW2d 801 (2005). Thus, the trial court had discretion to preclude expansion of the record on remand.

To the extent the trial court failed to exercise its discretion because it was following an erroneous interpretation of this Court's order to conduct the evidentiary hearing on the record that existed at the time the court granted defendants' original motions, plaintiffs are not entitled to relief because they failed to make an offer of proof of the additional literature they wanted to present.

Consequently, plaintiffs are unable to demonstrate that they were prejudiced by any error. *In re Williams*, 333 Mich App 172, 181; 958 NW2d 629 (2020) (concluding trial court's error in denying the respondent's right to present evidence because the respondent made "no offer of proof as to what specific further evidence could have been admitted or how it could have helped her position"); see also *Detroit v Detroit Plaza Ltd Partnership*, 273 Mich App 260, 291-292; 730 NW2d 523 (2006) (stating the plaintiff's failure to make an offer of proof meant the Court was "unable to determine whether the trial court erroneously excluded testimony that would have affected the [plaintiff]'s substantial rights").

In addition, the trial court did not err in finding that Dr. Futrell's and Dr. Venkatasubramanian's testimony was not based on sufficient facts or data, and not derived from reliable principles and methods. Plaintiffs attempted to prove that the likelihood of an improved outcome by timely administration of tPA was greater than 50 percent through interpretation of statistics in studies that did not decisively reach this conclusion. Dr. Futrell relied on an analysis by Dr. Justin Zivin of data from a study from the National Institute of Neurological Disorders and Stroke (NINDS). Dr. Futrell admitted that only a few vascular neurologists would be able to understand Dr. Zivin's method. She understood it only because she hired a statistician to help her learn. This testimony permitted the trial court to find that Dr. Zivin's methods were not generally accepted in the field. Moreover, Botsford's witness, Dr. Seemant Chaturvedi, M.D., highlighted additional problems with Dr. Zivin's analysis, namely that 97 patients from the NINDS study were disregarded without explanation.

Dr. Venkatasubramanian's testimony regarding Dr. Zivin's analysis also revealed flaws in the validity of her opinion. Dr. Venkatasubramanian failed to articulate an explanation for how she made certain calculations to arrive at her conclusion. The trial court made several attempts to elicit an explanation for how she made these calculations, but she failed to provide one. Dr. Venkatasubramanian also failed to provide a comprehensible explanation for how a majority of patients can have a favorable outcome on tPA when only one patient out of 4.5 has a favorable outcome. Dr. Chaturvedi testified that the proper calculation of the absolute benefit was a simple subtraction of 29.1 (percentage of placebo patients with good outcomes) from 41.6 (percentage of tPA patients with good outcomes) for an absolute benefit of 12.5 percent. This was not, as plaintiffs argue, a legitimate scientific controversy, but an opinion based on transparent mathematical calculation versus an opinion based on an unexplained and counterintuitive calculation.

The trial court did not misapply MRE 702 or MCL 600.2955 in concluding that Dr. Venkatasubramanian's and Dr. Futrell's opinions were not based on reliable methods. Their opinions were based on unsound statistical interpretations that produced results inconsistent with the body of research on stroke treatments with tPA. Therefore, the trial court did not abuse its discretion by excluding this expert testimony.

## C. ENDOVASCULAR INTERVENTION

Next, plaintiffs challenge the exclusion of testimony by Dr. Zoarski that timely consultation with an interventional neuroradiologist would have led to successful endovascular treatment. The trial court concluded after a *Daubert* hearing that none of the research on which

Dr. Zoarski relied showed that the probability of a more favorable outcome was greater than 50 percent. We affirm.

Dr. Zoarski opined that if defendants had ordered a CTA and consulted an interventional neurologist, the CTA would have revealed arterial occlusions that the interventional neurologist could have treated with some form of endovascular intervention. In order to satisfy the causation element of a medical malpractice action, plaintiffs had to prove a 50 percent or greater probability that plaintiff would have had a better outcome if he received endovascular intervention. Plaintiffs required expert testimony to satisfy this requirement but failed to satisfy it because none of the studies cited by Dr. Zoarski applied to a patient with tandem lesions in the neck and brain, and none recommended intervention before a stroke occurred. Although 51 to 52 percent of the intervention group patients in the MR CLEAN study, 62.1 percent in the REVASCAT study, and 70 percent in the ESCAPE study had a more favorable outcome than plaintiff, none of the patients in the REVASCAT or ESCAPE studies had a large infarct core. There also was no relative benefit when the patients receiving endovascular intervention and tPA were compared to patients who received tPA only. In addition, none of the research supported using endovascular intervention as a preventative measure in patients who had a carotid occlusion but no manifestations of stroke. Additionally, none of the studies showed that the benefit in tandem lesion patients outweighed the heightened risk of using the procedure. These considerations justified the trial court's finding that Dr. Zoarski's opinion was not supported by the research. Although research showed promise for endovascular intervention, it did not meet the 51 percent threshold for medical malpractice when applied to plaintiff's circumstances. See MCL 600.2955(1)(a) and (b). The basis of the opinion was not reliable because it did not apply to patients similarly situated to plaintiff. See MCL 600.2955(1)(f).

The trial court's analysis of this issue was consistent with its duty to conduct "a searching inquiry, not just of the data underlying" Dr. Zoarski's opinion, "but also of the manner in which [he] interpret[ed] and extrapolate[d] from those data." *Gilbert*, 470 Mich at 782. Moreover, most of the research was conducted after 2013, and therefore involved data that was not available at the time of plaintiff's injury. The trial court did not, as plaintiffs opine, make a choice between two scientifically valid theories, but properly decided that plaintiffs' theory was not scientifically valid.

Plaintiffs also argue that it was not appropriate for the trial court to consider the special problems of tandem lesion patients because Dr. Zoarski did not testify about tandem lesions on direct examination. Plaintiffs do not explain the legal premise of this argument or cite any authority in support. "An appellant may not merely announce his or her position and leave it to this Court to discover and rationalize the basis for his or her claims." *Johnson v Johnson*, 329 Mich App 110, 126; 940 NW2d 807 (2019) (quotation marks and citations omitted). The relevance of the treatment to tandem lesions was a key inquiry for determining whether the procedures were likely to achieve a more favorable outcome for plaintiff. This argument is without merit.

### D. SUMMARY DISPOSITION

Plaintiffs argue defendants were not entitled to summary disposition under MCR 2.116(C)(10) because the trial court's rulings on their motions in limine were in error. This argument is dependent on the success of plaintiffs' claims that the trial court abused its discretion excluding their experts' testimony.

-9-

A trial court's decision on a motion for summary disposition is reviewed de novo. *Heaton v Benton Constr Co*, 286 Mich App 528, 531; 780 NW2d 618 (2009). Summary disposition is appropriate under MCR 2.116(C)(10) if "there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Id*.

As explained, the trial court properly precluded plaintiffs' experts from testifying that, but for defendants' alleged breaches of the standard of care, plaintiff more likely than not would have achieved a more favorable outcome with respect to his level of disability three months after the stroke. Without this testimony, plaintiffs were unable to establish a genuine issue of material fact with respect to the likelihood of a lost opportunity of an improved outcome. Therefore, the trial court did not err by granting summary disposition in defendants' favor.

## E. DEFENDANTS' CROSS-APPEAL

In their cross-appeal, Botsford and the Glendale defendants argue the trial court abused its discretion by denying their motions to strike Dr. Futrell and Dr. Venkatasubramanian as expert witnesses on the ground that they did not share the same specialty as Dr. Pierce. We disagree.

We review for an abuse of discretion the "qualification of a witness as an expert and the admissibility of the testimony of the witness . . . ." *Surman v Surman*, 277 Mich App 287, 304; 745 NW2d 802 (2007). "An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes." *Jilek*, 297 Mich App at 665. Any preliminary questions of law, including the interpretation and application of statutes, are reviewed de novo. *Mueller v Brannigan Bros Restaurants & Taverns, LLC*, 323 Mich App 566, 571; 918 NW2d 545 (2018). The trial court "necessarily commits an abuse of discretion if it makes an incorrect legal determination." *Id*.

With respect to the standard of care for a specialist, "the plaintiff has the burden of proving that in light of the state of the art existing at the time of the alleged malpractice," the defendant "failed to provide the recognized standard of practice or care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances . . . ." MCL 600.2912a(1)(b). The standard of care applicable to a specialist in a medical malpractice action is "that of a reasonable specialist practicing medicine in the light of present day scientific knowledge." *Naccarato v Grob*, 384 Mich 248, 254; 180 NW2d 788 (1970).

MCL 600.2169(1) states, in pertinent part:

> In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:
>
> (a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action

in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.

      (b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:

      (*i*) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.

      (*ii*) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty.

Dr. Pierce was certified in the specialty of general neurology. Defendants argue that Dr. Futrell and Dr. Venkatasubramanian, conversely, were not qualified standard-of-care witnesses because they devoted more than half of their professional activities to their subspecialties and not to the specialty of general neurology.

There is no indication that Dr. Pierce was certified in any specialty or subspecialty other than general neurology. Accordingly, plaintiffs' expert had to have a specialty in general neurology and devote more than 50 percent of his or her professional time to general neurology. Overlap between general neurology and an expert's subspecialties cannot count toward determining which specialty was each expert's majority practice. The trial court considered the witnesses' affidavits in addition to their deposition testimony. "[A] witness is bound by his or her deposition testimony, and that testimony cannot be contradicted by affidavit in an attempt to defeat a motion for summary disposition." *Casey v Auto Owners Ins Co*, 273 Mich App 388, 396; 729 NW2d 277 (2006). The trial court found that Dr. Venkatasubramanian and Dr. Futrell submitted affidavits stating that they devoted the majority of their time in 2013 to general neurology. The court found that the affidavits did not directly contradict their deposition testimony, because the deposition testimony was not specific as to timeframes.

Dr. Futrell testified in her deposition that in 2013 she ran an urgent care TIA clinic. It provided all the diagnostic services that a hospital offered, but more quickly because 10 to 12 percent of TIA patients will have a stroke. She testified about her work at the clinic:

      *Q*. So tell me a little bit more, so this was in 2013, that was your sole source of employment was this walk-in TIA clinic?

      *A*. And some royalties from the book but that was relatively minor.

      *Q*. Okay. How many patients would you see in a given unit of time, day, week, month or year?

*A.* It was highly variable. I didn't see as many patients as some physicians would see because I not only saw the patient, but as I do now, I read and interpret CT scan, the MRI scan, the carotid ultrasound, the heart monitor. The only thing I didn't interpret was the cardiac echo, and I still do that, I still interpret all of the studies, so most—since most neurologists don't do that, they may crank through more individual patients, but I provide more services to the patients.

Dr. Futrell stated that most neurologists are not certified to interpret films, but she was. She also stated that vascular neurology was "a subspecialty of neurology. It's a little bit like internal medicine and cardiology." When asked to describe the difference between a neurologist and a vascular neurologist, she said that a vascular neurologist had "additional expertise in blood vessels and vascular physiology, including heart, blood clotting, more background in pharmacology and more skills in reading MRI and CT scans and more skills in ultrasounds . . . ." Vascular neurologists were better prepared to care for "difficult stroke patients." When asked if the difference between a vascular neurologist and a neurologist was as "stark" as the difference between a cardiologist and an internal medicine specialist, she agreed that it was. She stated in her affidavit:

[F]rom approximately February 2012 to February 2013, I was in active clinical neurology practice both at my clinic in Utah and in Ohio. While I have a board certification in Vascular Neurology, that subspecialty is only relevant in roughly 10-20% of the patients that I treat. The remaining patients, be they stroke patients or patients suffering from other neurological aliments [sic], are all characterized as neurology patients. Thus, during the time period from February 2012 to February 2013, I was in the active clinical practice of neurology. Vascular Neurology is a subspecialty of Neurology, and as such whenever I am practicing Vascular Neurology I am also practicing Neurology generally because in order to be able to practice Vascular Neurology I must rely on the knowledge, training, and experience I have gained as a Neurologist.

Although Dr. Futrell testified in her deposition that she ran an urgent care TIA clinic in 2013, and her testimony suggested that she devoted less than 50 percent of her time to the practice of general neurology, she did not address the specific period from February 2012 to February 2013. Conversely, in her affidavit, she quantified the practice of her subspecialty as 10 to 20 percent of the patients she treated from February 2012 to February 2013, the relevant one-year period. The trial court correctly concluded that this statement did not contradict her deposition testimony because her deposition testimony was imprecise regarding the relevant time period. In the absence of a clear contradiction between the affidavit and her deposition testimony, the trial court did not abuse its discretion or deviate from the statutory requirements by determining that Dr. Futrell was qualified as an expert.

Dr. Venkatasubramanian testified in her deposition that she was board-certified in vascular neurology and neurocritical care. She did not clearly quantify how her specialties were distributed across her clinical practice and instruction. She stated that some vascular neurologists did not see patients for other neurological problems such as multiple sclerosis or headaches. In 2015, she testified in depositions in other cases that 80 percent of her practice time was devoted to critically ill patients in a neurointensive care unit. In these depositions, Dr. Venkatasubramanian spoke in

the present tense, without specifying her activities in the 2012 to 2013 period. In her affidavit, Dr. Venkatasubramanian specified that she spent the majority of her time in the clinical practice and instruction of neurology:

> 1. . . . In the year immediately preceding the events at issue in this matter, the period from approximately February 2012 to February 2013, I was in active clinical practice at the Stanford University Medical Center, and was a full time Assistant Professor of Neurology and Neurological Sciences, Clinician Educator Line, at the Stanford University School of Medicine. As part of my duties as an Assistant Professor of Neurology I was responsible for providing instruction to medical students, residents, and fellows in the practice of neurology. This instruction included both lecturing and clinical work. Due to my responsibilities as an Assistant Professor of Neurology, whenever I was practicing clinically during the period from February 2012 to February 2013, I was expected to provide instruction in the specialty of neurology. As a result, between my clinical practice of neurology, and my teaching as an Assistant Professor of Neurology, I spent the majority of my professional time in the combined clinical practice and instruction of neurology during the period from February 2012 to February 2013.

The trial court did not abuse its discretion by giving greater weight to the year-specific statement in the affidavit than to the nonspecific statements in the 2015 depositions in other cases. Accordingly, the trial court did not abuse its discretion by denying defendants' motions to strike Dr. Futrell and Dr. Venkatasubramanian as expert witnesses on the ground that they did not share the same specialty as Dr. Pierce.

VII. DOCKET NO. 356404

Plaintiffs argue that the trial court erred by awarding Botsford and the Glendale defendants costs under MCR 2.625. We disagree.

"This Court reviews a trial court's ruling on a motion for costs under MCR 2.625 for an abuse of discretion." *Fansler v Richardson*, 266 Mich App 123, 126; 698 NW2d 916 (2005). "The determination whether a party is a 'prevailing party' for the purpose of awarding costs under MCR 2.625 is a question of law, which this Court reviews de novo." *Id.*

MCR 2.625(A)(1) provides that costs "will be allowed to the prevailing party in an action . . . ." In Docket No. 353920, we concluded that the trial court did not abuse its discretion by precluding plaintiffs from offering their proposed expert testimony. Plaintiffs do not dispute that Botsford and the Glendale defendants therefore qualify as prevailing parties eligible for costs under MCR 2.625. Plaintiffs argue, however, that the trial court improperly included expert witness fees in its order imposing costs under MCR 2.625.

MCL 600.2164 provides:

> (1) No expert witness shall be paid, or receive as compensation in any given case for his services as such, a sum in excess of the ordinary witness fees provided by law, unless the court before whom such witness is to appear, or has appeared, awards a larger sum, which sum may be taxed as a part of the taxable costs in the

case. Any such witness who shall directly or indirectly receive a larger amount than such award, and any person who shall pay such witness a larger sum than such award, shall be guilty of contempt of court, and on conviction thereof be punished accordingly.

(2) No more than 3 experts shall be allowed to testify on either side as to the same issue in any given case, unless the court trying such case, in its discretion, permits an additional number of witnesses to testify as experts.

(3) The provisions of this section shall not be applicable to witnesses testifying to the established facts, or deductions of science, nor to any other specific facts, but only to witnesses testifying to matters of opinion.

Plaintiffs construe the phrase, "the court before whom such witness is to appear, or has appeared," as limiting expert witness fees to experts who testified at trial. They argue that this precludes an award of fees for experts in cases that were dismissed before trial. We disagree.

In *Home-Owners Ins Co v Andriacchi*, 320 Mich App 52, 73; 903 NW2d 197 (2017), this Court stated:

In *Herrera v Levine*, 176 Mich App 350, 357-358, 439 NW2d 378 (1989), this Court concluded: "The language 'is to appear' in § 2164 applies to the situation at bar in which the case was dismissed before defendant had a chance to call its proposed expert witnesses at trial. Furthermore, the trial court was empowered in its discretion to authorize expert witness fees which included preparation fees." Hence, a party may recover expert fees under MCL 600.2164 where a case is dismissed before that expert can testify at trial.

In *Herrera*, the plaintiff's counsel conceded on the day of trial that the plaintiff was unprepared for trial. The trial court dismissed the action with prejudice. *Herrera*, 176 Mich App at 355. Plaintiffs ask this Court to distinguish expert fees that directly pertain to an expert's preparation to appear at trial, and are therefore compensable, from other types of expert fees that are not connected to preparation for trial. Plaintiffs cite caselaw that addresses noncompensable expert fees. For example, in *Van Elslander v Thomas Sebold & Assoc, Inc*, 297 Mich App 204, 219; 823 NW2d 843 (2012), this Court stated that expert witnesses are "not automatically entitled to compensation for all services rendered," and listed conferences with counsel "for purposes such as educating counsel about expert appraisals, strategy sessions, and critical assessment of the opposing party's position" as noncompensable fees. In *Mich Citizens for Water Conservation v Nestle Waters North America, Inc*, 269 Mich App 25, 109-110; 709 NW2d 174 (2005), rev'd in part on other grounds 479 Mich 280 (2007), we held that the trial court abused its discretion when it failed to address the defendant's objections to specific fee items because it would require "an extraordinary effort here to go through the extensive materials attached to the affidavits to determine minute by minute how much of each would be pure consultation and as to how many minutes of each" were compensable preparation costs. We remanded the case to the trial court to adjust the costs by recalculating which fees were taxable expenses. *Id*. at 110.

In the trial court, plaintiffs never responded to the Glendale defendants' motion for costs. The trial court addressed each of plaintiffs' objections to Botsford's motion to determine whether the contested items pertained to nontaxable costs, such as strategy sessions, and excluded items that "did not contain sufficient phrasing." On appeal, plaintiffs fail to identify any items that they believe the trial court erroneously considered and improperly taxed. Therefore, plaintiffs have not established any error entitling them to relief. See *Johnson*, 329 Mich App at 126.

Affirmed. Defendants, as the prevailing parties, may tax costs.

/s/ Kirsten Frank Kelly
/s/ David H. Sawyer
/s/ Michael F. Gadola